**PHILIP MORRIS, INC., et al., Plaintiffs,**

v.

**BROWN & WILLIAMSON TOBACCO CORP., Defendant.**

**Civ. A. No. 84–255–3–MAC.**

United States District Court, M.D. Georgia, Macon Division.

Aug. 20, 1986.

Cubbedge Snow, Jr., Martin, Snow, Grant & Napier, Macon, Ga., Albert E. Fey, W. Edward Bailey, Thomas L. Secrest, Denise L. Loring, Fish & Neave, New York City, James E. Schardt, Richmond, Va., David L. Rae, Montvale, N.J., for plaintiffs.

Bruce W. Baber, Frank C. Jones, Atlanta, Ga., Daniel H. Dane, New York City, Charles G. Lamb, Louisville, Ky., for defendant.

OWENS, Chief Judge:

On June 1, 1984, Philip Morris, Inc. and the BOC Group, Inc. brought suit in this court against Brown and Williamson Tobacco Corporation alleging infringement of United States Patent Re. 32,013 entitled "Expanding Tobacco" and United States Patent 32,014 entitled "Process for Expanding Tobacco." Plaintiffs also assert additional causes of action against defendant for breach of contract, unjust enrichment, and misappropriation of trade secrets. In answering plaintiffs' complaint,

Brown & Williamson denied infringement and raised the following affirmative defenses: invalidity under 35 U.S.C. §§ 102, 103, and 112; unenforceability due to inequitable conduct before the Patent and Trademark Office in procuring the patents; and numerous equitable defenses including laches, estoppel and unclean hands with respect to counts II, III and IV—the contract claims. In addition, Brown & Williamson has counterclaimed for antitrust violations specifically alleging violations of sections 1, 2 and 4 of the Sherman Act, 15 U.S.C. §§ 1, 2 and 4, and sections 3, 4 and 16 of the Clayton Act, 15 U.S.C. §§ 14, 15 and 26. An injunction, accounting, treble damages, costs and attorney fees are sought by plaintiffs. Defendant in turn seeks a declaratory judgment that the patents in suit are invalid, unenforceable, and not infringed, an injunction, treble damages under 15 U.S.C. § 15, costs and attorney fees. The case was tried before the court sitting without a jury on October 28 through November 8, 1985. This constitutes the court's findings of fact and conclusions of law[1] in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

### Findings of Fact

#### The Parties

1. Plaintiff Philip Morris Incorporated ("Philip Morris") is a Virginia corporation which is engaged in the business of processing, manufacturing and selling tobacco and tobacco products. Trial Vol. I at 74–75. In 1985, Philip Morris was the largest tobacco company in the United States. Trial Vol. II at 120.

2. Plaintiff the BOC Group, Inc. ("BOC") is a Delaware Corporation which is engaged in the business of producing and selling industrial gases. BOC was formerly known as Airco, Inc. and will be referred to herein by its present name unless the context or direct quotation dictates otherwise.

3. Defendant Brown & Williamson Tobacco Corporation ("B & W") is a Delaware corporation which has a place of business in Macon, Georgia. B & W is engaged in the business of processing, manufacturing and selling tobacco and tobacco products. Trial Vol. VII at 622–24. B & W is presently a wholly owned subsidiary of B.A.T. Industries PLC ("Industries"), a British corporation. Defendant's Exhibit 340C at 6; Trial Vol. VII at 664–65. Prior to June of 1979, B & W was a subsidiary of British-American Tobacco Company, Ltd. ("BATCO") which is the world's largest tobacco company. Defendant's exhibit 340C at 1–3; Trial Vol. I at 4; Vol. VII at 689. Industries is the parent corporation of B & W and BATCO and has been so at all times relevant to this action. Trial Vol. VIII at 751–53; Defendant's exhibit 340C.

#### The Patents in Suit

4. United States Patent Re. 32,013 (hereinafter the "'013 patent") entitled "Expanding Tobacco" was reissued by the United States Patent and Trademark Office ("PTO") on October 29, 1985, upon an application filed June 28, 1984. Plaintiffs' exhibit 1. The '013 patent is the invention of Roger Z. de la Burde and Patrick Aument and is assigned to Philip Morris, Inc. *Id.* The '013 patent is a reissue of United States Patent No. 4,340,073 (the "'073 patent") which issued on July 20, 1982, upon an application filed February 12, 1974. Plaintiffs' exhibit 38.

5. United States Patent Re. 32,014 (hereinafter the "'014 patent") entitled "Process for Expanding Tobacco" was reissued by the PTO on October 29, 1985, upon an application filed June 28, 1984. Plaintiffs' exhibit 1A. The '014 patent is the invention of Larry M. Sykes, Ray G. Snow, Roger Z. de la Burde, and Patrick E. Aument and is assigned to Philip Morris, Inc. *Id.* The '014 patent is a reissue of United States Patent No. 4,336,814 (the "'814 patent") which issued on June 29, 1982, on an application filed September 5, 1979. Plain-

---

**1.** In a case where the record consists of a trial transcript in excess of 1,350 pages, exclusive of final argument, and some 800 plus exhibits as well as numerous, lengthy depositions, the sheer magnitude of the evidence presented precludes addressing each and every issue raised in detail.

tiffs' exhibit 39. The '014 patent is an improvement patent related to the original '073 patent and its reissued counterpart, the '013 patent. Plaintiffs' exhibit 1A, col. 3, lines 33–52.

6. When green tobacco is cured it necessarily loses some of its original moisture content resulting in a collapse of the leaf's cell structures and a corresponding decrease in volume compared to the volume of the same batch of tobacco in its green state. Trial Vol. IV at 292–93; defendant's exhibit 349 at 1. The purpose of the inventions embodied in the patents in suit is to treat tobacco so as to expand its volume and make up for weight lost in the curing process, i.e., "return the leaf back to much of the physical science it was in in the green state." Trial Vol. III at 265; Vol. IV at 292–93; defendant's exhibit 349 at 1–2; defendant's exhibit 350 at 2, ¶ 8. Expanding the volume of tobacco is advantageous because it increases the filling power of tobacco enabling more cigarettes to be manufactured per pound of tobacco while achieving lower tar and nicotine levels than smoking product made of non-expanded tobacco. Trial Vol. IV at 293–94; plaintiffs' exhibit 1, col. 1, lines 18–25; defendant's exhibit 350 at 2, ¶ 8.

7. The invention of the '013 patent is a process for expanding tobacco utilizing liquid carbon dioxide ($CO_2$) as the expansion agent. Plaintiffs' exhibit 1, col. 3, lines 57–58. The claims are directed toward a process, methods and apparatus for expanding tobacco using liquid carbon dioxide as the expansion agent. Id. at col. 12, line 48—col. 16. Carbon dioxide is a heavy colorless gas that does not exist as a liquid at ambient or atmospheric pressure. Trial Vol. I at 83–85; Vol. II at 161–64; Vol. IV at 285; Vol. XI at 1126. Carbon dioxide is a natural constituent of tobacco. Trial Vol. I at 91.

8. Claim 1, the broadest process claim of the '013 patent allegedly infringed, is representative and reads as follows:

1. A process for expanding tobacco comprising the steps of (1) contacting tobacco with liquid carbon dioxide under conditions such that the temperature of the tobacco is maintained at a level no lower than about —2° C. and such that substantially all of the liquid carbon dioxide is maintained in liquid form to impregnate the tobacco with the liquid carbon dioxide, (2) subjecting the liquid carbon dioxide-impregnated tobacco to conditions such that the liquid carbon dioxide is converted to solid carbon dioxide and (3) thereafter subjecting the solid carbon dioxide-containing tobacco to conditions whereby the solid carbon dioxide is vaporized to cause expansion of the tobacco.

Plaintiffs' exhibit 1, col. 12, lines 49–61.

9. Claims 1, 5, 16 and 17 of the '013 reissue patent are identical to their corresponding claims in the '073 patent. Compare plaintiffs' exhibit 1, col. 12–14 with plaintiffs' exhibit 38, col. 12–14. Claims 5 and 17 are directed toward apparatus for expanding tobacco, and claim 16 is directed toward a method of expanding tobacco. Plaintiffs' exhibit 1, col. 12–14.

10. The '014 reissue patent discloses and claims an improvement to the basic process of the '013 patent. Plaintiffs' exhibit 1A, col. 3, lines 33–52. One improvement consists of controlling the input moisture of the tobacco in the first step thereby enabling the process to operate at lower pressures than were originally considered optimal. Id. at col. 4, lines 44–68. An additional improvement consists of controlling the output moisture of the product recovered from the heating step so that the output moisture is preferably no higher than approximately 6%. Id. at col. 8, lines 59–68.

11. Claims 1 and 2 of the '014 patent are allegedly infringed and read as follows:

1. In the method of expanding tobacco which comprises the steps of (1) impregnating the tobacco with liquid carbon dioxide under conditions such that substantially all of the liquid carbon dioxide is maintained in liquid form so [sic] impregnate the tobacco with the liquid carbon dioxide, (2) subjecting the liquid carbon dioxide-impregnated tobacco to conditions such that the liquid carbon

dioxide is converted to solid carbon dioxide and (3) thereafter subjecting the solid carbon dioxide-containing tobacco to conditions whereby the solid carbon dioxide is vaporized to cause expansion of the tobacco, the improvement which comprises: (i) utilizing as the tobacco which is employed in step (1) a tobacco which has an OV content of from about 17 to about 30%, (ii) conducting the impregnation step under pressure in the range of from about 250 psia to about 450 psia, and (iii) conducting the third step in such a manner that the moisture content of the expanded tobacco obtained from the third step is no higher than about 6%.

2. The method of expanding tobacco of claim 1, wherein the impregnation step is conducted at a pressure of from about 350 psia to about 450 psia and the tobacco which is employed in step (1) has an initial OV content of from about 17 to about 25%.

*Id.* at col. 12, lines 65–68—col. 13, lines 1–20. Claims 1 and 2 of the '014 reissue patent are identical to their corresponding claims in the original '814 patent. *Compare* plaintiffs' exhibit 1A, col. 12–13 *with* plaintiffs' exhibit 39, col. 12–14. Claim 1 of the '014 patent is essentially identical to claim 16 of the '013 patent until the language "the improvement which comprises ..." *Compare* plaintiffs' exhibit 1A, col. 12, lines 65–68—col. 13, line 8 *with* plaintiffs' exhibit 1, col. 14, lines 31–41.

12. Mr. Sykes, one of the inventors of the '014 patent, testified[2] that the major advantages of the improved process were safety and economy. Trial Vol. III at 216. By combining higher input moisture levels for the tobacco with relatively lower output moisture levels, good expansion was achieved at significantly lower pressures— about 400 p.s.i.g.[3]—which in turn enabled a simpler design with safer operating levels and less thermal stress on the apparatus. Trial Vol. III at 214–216; *see also* plain-

tiffs' exhibit 1A, col. 4, lines 44–68—col. 5, lines 1–31.

13. The '013 and '014 patents-in-suit teach processes for expanding tobacco lamina or leaf as well as stems and reconstituted tobacco. Plaintiffs' exhibit 1, col. 4, lines 40–44. Tobacco leaf is the most expensive component of a cigarette. Trial Vol. I at 80. Tobacco leaf and tobacco stems have different cell structures; therefore, expansion of tobacco leaf or lamina involves different technology than expansion of tobacco stems. Trial Vol. II at 143; Vol. III at 264–265; *cf.* Sanford deposition at 654.

14. Tobacco men measure the moisture content of tobacco in terms of "O.V." an abbreviation of "oven volatiles" which is expressed as "X % O.V." Trial Vol. III at 220–26, Vol. IV at 325–26. The '014 patent discloses Philip Morris' method of calculating O.V. as follows: "The sample of tobacco filler is weighed before and after exposure for 3 hours in a circulating air oven at 100° C. The weight loss as percentage of initial weight is oven-violatiles content." Plaintiffs' exhibit 1A, col. 5, lines 60–63.

15. B & W has its own, slightly different method of measuring moisture. Trial Vol. III at 247; Vol. VIII at 840. B & W's method measures weight loss of a sample of tobacco before and after being placed in a forced air oven at 110° C. for three hours and fifteen minutes. Trial Vol. VIII at 839–40, Vol. X at 942–43. B & W's method of measuring O.V. or tobacco's moisture content gives a higher percentage reading than the Philip Morris method. Trial Vol. IV at 325, Vol. VII at 616; Vol. VIII at 840; Vol. X at 943.

16. Dr. Burde, a Philip Morris research scientist, began working with carbon dioxide to expand tobacco in late 1971. Trial Vol. II at 144. His initial work was with $CO_2$ gas and equipment used in the cereal industry, puffing guns. *Id.* at 145. The

---

2. When the court refers to the testimony of a witness, this indicates that the court accepted that testimony and found it as a fact unless otherwise indicated as opinion testimony or the like.

3. The expression "p.s.i.g." is an abbreviation of pounds per square inch gauge which is the unit of measurement employed to measure pressure. *See* Trial Vol. X at 948.

gas work was disappointing from a commercial standpoint due to non-uniform expansion results; consequently in March, 1972, Dr. Burde conceived the idea of using "liquid $CO_2$ to increase penetration into tobacco." Plaintiffs' exhibit 598 at 2; trial Vol. II at 145–48. By March—April of 1972, Dr. Burde had visualized and described impregnating tobacco with liquid carbon dioxide or nitrogen, converting the liquid $CO_2$ to a solid, and feeding the "tobacco with dry ice in it ... into a tower to seek suitable expansion." Plaintiffs' exhibit 665 at 60–61, 63; trial Vol. II at 150. Dr. Burde contacted BOC and a few other companies in March, 1972, to discuss availability of equipment and facilities for conducting experiments exposing leafy materials to $CO_2$. Trial Vol. II at 148–50. Dr. Burde contacted outside companies because Philip Morris' research labs did not have the high pressure equipment required to liquify $CO_2$. Trial Vol. I at 85–86; Vol. II at 148. Dr. Burde spoke to and met with Mr. Chester Michals at BOC regarding his need to experiment with high pressure equipment; however, they disagree as to who was the first to advise whom of the necessity of employing higher pressures. Trial Vol. II at 151–52, 156–57; cf. Michals deposition at 36–37, 50–52, 59.

17. On February 4, 1975, the PTO declared an interference between claims 16 and 17 of the Burde and Aument patent application (predecessor of the '013 patent in suit), serial number 441,767, and claims 18 and 19 of Chester Michals' patent application, serial number 439,804. Defendant's exhibit 330 at 3002; see also defendant's exhibit 54 at 42; defendant's exhibit 333 at 41–43. Examiner Melvin Rein was the initial examiner of both applications; Vincent Millin later became the primary examiner for both applications and ultimately the '013 and '014 patents in suit. Cf. defendant's exhibit 54 at 1–2 and defendant's exhibit 333 at 1; compare plaintiffs' exhibits 1 and 1A with plaintiffs' exhibits 38 and 39.

18. The Michals patent application, assigned to Airco, Inc. (now The BOC Group), like the patents in suit discloses a method and apparatus for expanding tobacco using liquid carbon dioxide as the expansion agent. Defendant's exhibit 54 at 2–3, 27. Mr. Michals' interest in expanding tobacco with carbon dioxide began when he was contacted by Dr. Burde of Philip Morris; Mr. Michals had no prior experience or knowledge of using carbon dioxide in connection with tobacco. Michals deposition at 37.

19. In March, 1973, a series of tests were conducted at BOC in the presence of Mr. Aument, Dr. Burde (present at some of the tests) of Philip Morris and Mr. Victor Pietrucha of BOC. Trial Vol. II at 184–90; defendant's exhibit 349 at 5, 11. Nine tests were run of which only three were arguably successful. Defendant's exhibit 349 at 10–12. Both BOC and Philip Morris filed patent applications in February, 1974, claiming the subject matter of these tests—a process for expanding tobacco with liquid carbon dioxide—and the PTO declared an interference. E.g., defendant's exhibit 54; defendant's exhibit 333; defendant's exhibit 349; fact finding 15, supra.

20. The Board of Patent Interferences awarded priority of invention to Chester Michals of BOC based on its determination that Michals was first to conceive and reduce the invention to practice. Defendant's exhibit 349 at 15. The Board also found that application of positive heat was not necessary to expand tobacco. Id. at 5–6, 14–15. However, the Board explicitly noted that Mr. Michals conceded his conception of the invention did not include application of positive heat and stated, "If we were to require such an application of heat, we would find that Burde, et al., were the first to conceive and reduce the invention to practice." Id. at 6.

21. Philip Morris appealed the decision of the Board of Patent Interferences to the United States District Court for the District of New Jersey, Judge Lacey presiding. Defendant's exhibit 350. Judge Lacey reversed the Board and awarded priority of invention to Philip Morris, assignee of the Burde application, based on two series of

*inter partes* tests that demonstrated the following:

50. The Richmond tests, which Airco concedes were correct (Steinberg Tr. 255), establish as a matter of scientific fact that tobacco impregnated with solid carbon dioxide and allowed to degas at ambient temperature without the application of positive heat does not expand. Indeed, the Richmond tests establish that tobacco so treated experiences a measurable reduction in filling capacity. (citation to record omitted).

51. The Richmond tests also establish as a matter of scientific fact that tobacco impregnated with solid carbon dioxide and subsequently exposed to temperatures in excess of ambient temperature expands substantially, on the order of 100% or more. (citation to record omitted).

*Id.* at 14, fact findings 50 and 51.

22. Judge Lacey concluded that the Board of Patent Interferences made a clear mistake in awarding priority to Michals because without the application of positive heat as the last step, there was no complete conception of the invention and no successful reduction to practice. *Id.* at 18, 22, 24–25. Judge Lacey characterized Michals' conception of the invention as incomplete and a failure because it failed to produce expanded tobacco. *Id.* at 26, 28. There is no evidence of record in the present case indicating that the New Jersey District Court was in error.

23. While the interference proceedings and appeal to the New Jersey District Court were pending, BOC and Philip Morris entered into two license agreements with respect to the interference proceedings. Defendant's exhibits 158 and 159. The first license agreement, dated December 1, 1975 (defendant's exhibit 158) was superseded and replaced by a second agreement dated November 1, 1977 (defendant's exhibit 159). Among other things, this cross license agreement provided that no matter which party ultimately prevailed in the interference action, the company determined to own the patent rights at issue would have the right to set royalty rates for licensing the invention. Defendant's exhibit 159 at 16, ¶ 6(d)(e) and 18, ¶ 7(b). Additionally, each party agreed to grant the other a nonexclusive, irrevocable, royalty free license under its patent rights (in the event a patent issued) with Philip Morris also granting BOC the right to grant licenses to third parties under Philip Morris' patent rights. *Id.* at 12–14; *see also* defendant's exhibit 350 at 7, ¶ 23.

24. Philip Morris' attorney notified the PTO of the decision of the New Jersey District Court in the interference action and filed a copy of the judgment with the PTO. Defendant's exhibit 333 at 61. Claims 1–17 of the Burde patent application were subsequently allowed by Examiner Millin and issued as United States Patent Number 4,340,073 (predecessor of the '013 patent in suit) on July 20, 1982. Defendant's exhibit 333 at 1, 65; plaintiff's exhibit 38.

25. BOC withdrew the Michals patent application, serial number 439,804 from issue due to the decision of the New Jersey District Court awarding priority to Burde. Defendant's exhibit 54 at 109–10. BOC attached a copy of Judge Lacey's opinion to its petition for withdrawal. *Id.* at 122–49. Examiner Millin rejected BOC's remaining active claims on April 22, 1982, as unpatentable over the issues in the interference in which BOC was the losing party. *Id.* at 155–57. Finally, Examiner Millin declared the Michals application abandoned on January 4, 1983. *Id.* at 165. Thus, the PTO was informed by the applicants of the facts of Philip Morris' and BOC's liquid $CO_2$ tobacco expansion work in 1972 and 1973, the outcome of the interference proceeding, and the judgment and opinion of the United States District Court for the District of New Jersey awarding priority of invention to Philip Morris. *See generally* defendant's exhibits 333 and 54; fact finding 24, *supra.*

26. Michals' work, with the addition of a positive heat step, is the subject of BOC patents in some nine foreign countries. Plaintiffs' exhibit 486 at 2; defendant's exhibit 54 at 97–98; *see also* fact finding 52, *infra.*

27. Philip Morris has obtained patents based on Dr. Burde's work in at least fifteen foreign countries. Plaintiffs' exhibit 486 at 1.

28. The commercial embodiment of the inventions of the '013 and '014 patents in suit is known in the tobacco industry as the "DIET" process, an acronym for Dry Ice Expanded Tobacco. Trial Vol. I at 83; Vol. II at 114–115; Vol. III at 215. The DIET process was the first commercial high order expansion process to leave no discernible trace of its expansion agent, $CO_2$, in the tobacco. Trial Vol. I at 91; Vol. II at 114–15.

29. High order tobacco expansion process refers to processes that achieve a significant increase in tobacco's filling capacity as opposed to low order processes which obtain a relatively lower increase in filling capacity. Jewell deposition at 33–35; Willis deposition at 120–21. Filling power or filling capacity refers to the ability of tobacco to fill a cigarette tube. Jewell deposition at 17.

30. Philip Morris and BOC have developed and assembled a body of technical knowledge relating to the commercial practice of the DIET technology and process known as the DIET know-how or know-how. Trial Vol. V at 388–89; defendant's exhibit 159 at 19–27. BOC offers a know-how license and a patent license package which includes the know-how to potential licensees interested in practicing the DIET process pursuant to its cross license agreement with Philip Morris. Trial Vol. V at 383, 388; defendant's exhibit 159 at 24.

*The Graham Findings*

31. The tobacco industry's first commercial high order tobacco expansion process was developed by the R.J. Reynolds Tobacco Company and made public in 1969. Trial Vol. I at 80. The process is known as G–13 and uses trichloromonofluoromethane, a synthetic chemical marketed under the trademark freon, as the expansion agent. Trial Vol. I at 80, Vol. II at 112. Reynolds claims that the G–13 expansion process can double the volume of cured tobacco lamina thereby saving one percent of tobacco for each percentage of expanded tobacco used. Trial Vol. I at 80, Vol. II at 126. Tobacco expanded by the G–13 process has a detectable residue of freon left in it after treatment. Trial Vol. I at 82, Vol. II at 112, Vol. III at 273–74.

32. R.J. Reynolds' G–13 process was made available to the tobacco industry for license; however, Philip Morris, after investigation of the process, decided not to take a G–13 license. Trial Vol. I at 112. Mr. Goldsmith, then Chief Executive Officer of Philip Morris, Inc., personally decided against the G–13 process because of the freon residue left in the tobacco and the potential negative public relations effects of freon usage. *Id.* at 112, 118. Instead Philip Morris set out to develop its own expansion process, and Joe Lloyd was appointed project leader of the development program. Trial Vol. I at 82, Vol. II at 113, Vol. III at 274–76. Philip Morris' efforts resulted in development of two commercial processes: ammonium carbonate and the liquid $CO_2$ DIET process. Trial Vol. I at 82–83, Vol. II at 113–114, Vol. III at 274–78.

33. Brown and Williamson took a license from Reynolds for a small scale G–13 expansion process known as G–13C that was capable of about 400 pounds per hour production. Trial Vol. VII at 659, 690.

34. B & W and its parent corporation, BATCO, were concerned about the negative public relations and environmental impact of freon-expanded tobacco. Willis deposition at 39–42, 75; Sanford deposition at 256–58; Gordon deposition at 30–31. B & W's president, Dr. I.W. Hughes, told Mr. Goldsmith at Philip Morris "that he felt it was unconscionable for Reynolds to use freon in the expansion of tobacco." Trial Vol. II at 116. BATCO's Board of Directors recommended that its associate companies make no further investments in G–13 plants because of the environmental controversy over freon's effect on the ozone layer and the residual freon left in the tobacco. Trial Vol. VIII at 721–22, 769. B & W has abandoned use of its G–13C facilities since the Macon expanded tobacco plant became operational. Trial Vol. VII at

690–91. In effect, B & W and BATCO compared the DIET process with the G–13 process and ultimately chose to use DIET. Trial Vol. VII at 691–93, Vol. VIII at 722–23, 735–38.

35. B & W identifies two South African patents assigned to R.J. Reynolds, Numbers 70/8291 and 70/8292, as the most pertinent prior art references. Trial Vol. IX at 931; defendant's pre-trial proposed fact finding 120.

36. South African patent 70/8292 (Frederickson) published August 25, 1971, and assigned to R.J. Reynolds, is entitled "Process for Expanding Tobacco." Defendant's exhibit 254. It discloses impregnating tobacco "with carbonated water and thereafter rapidly heating or reducing the ambient pressure to release carbon dioxide within the impregnated tobacco and to expel by vaporization at least a portion of the water from the tobacco." Id. at 1A, lines 3–6. Other gas-liquid solutions may be used. Id. at 1A, line 7; 5, 7–8. This patent was disclosed to the PTO during the prosecution of the applications of the patents in suit. Plaintiffs' exhibit 1, col. 1, lines 39–45; col. 2, lines 57–62; plaintiff's exhibit 1A, col. 1, lines 26–33; col. 2, lines 44–49; plaintiffs' exhibits 38 and 39.

37. South African patent 70/8291 (Frederickson) published August 25, 1971, and assigned to R.J. Reynolds is entitled "Tobacco Expansion Process." Defendant's exhibit 253. It discloses (1) impregnating tobacco with a non-gaseous chemical compound that is heated to decompose the compound and form a gas that expands the tobacco or (2) contacting the compound impregnated tobacco with an extraneous gas releasing agent to liberate the gas causing expansion. Id. at 1A, 3–6, 11–12. The preferred compounds include the organic and inorganic carbonates, carbamates, peroxides, salts, and some acids. Id. at 5–6. This patent was disclosed to the PTO during prosecution of the applications for the patents in suit. Plaintiffs' exhibit 1, col. 2, lines 57–62; plaintiffs' exhibit 1A, col. 2, lines 44–49; plaintiffs' exhibits 38 and 39.

38. Neither one of the South African patents teaches use of liquid carbon dioxide as the expansion agent, nor use of pressures sufficient to maintain $CO_2$ as a liquid, nor reducing pressure to convert the liquid into a solid impregnant, nor heating tobacco impregnated with a solid impregnant. Trial Vol. IX at 929–31. Neither do these patents speak to formation of a hydrate inside the tobacco. Id. at 930.

39. United States Patent Number 1,789,435 (Hawkins) issued January 20, 1931, relates to expanding tobacco by subjecting or contacting cured tobacco with a suitable gas such as air, carbon dioxide or steam, under low pressure of about 20 pounds for some 45 minutes. Plaintiffs' exhibit 299. It also teaches heating the gas to facilitate the process. Id. at col. 3, lines 40–44. The Hawkins patent was disclosed to the PTO during prosecution of the applications for the patents in suit. Plaintiffs' exhibit 1, col. 1, lines 52–62; plaintiffs' exhibit 1A, col. 1, lines 39–49; plaintiffs' exhibits 38 and 39. The Hawkins patent does not teach the use of liquid carbon dioxide as an impregnant or the use of pressures sufficient to maintain $CO_2$ in liquid form. Plaintiffs' exhibit 299.

40. United States Patent Number 4,153,063, issued May 8, 1979, is the American counterpart to German patent 2,142,-205. Defendant's exhibit 327. It teaches the use of liquid carbon dioxide as a solvent to extract nicotine from tobacco. Id. It also teaches the use of alternative solvents as extraction agents. Id. The German counterpart of this patent was disclosed to the PTO during prosecution of the applications for the patents in suit. Plaintiffs' exhibit 1, col. 3, lines 48–54; plaintiffs' exhibit 1A, col. 3, lines 26–32; plaintiffs' exhibits 38 and 39. Examiner Millin, who examined the applications for the patents in suit, was the assistant examiner of United States patent 4,153,063. Defendant's exhibit 327. This patent does not teach use of liquid $CO_2$ to expand tobacco. Id.

41. United States Patent Number 3,771,533 (Armstrong), issued November 13, 1973, and is assigned to Philip Morris. Defendant's exhibit 316. It discloses a tobacco expansion process that utilizes a

combination of ammonia and carbon dioxide gases as *in situ* impregnants and thereafter heating to between 250° and 700° F to puff the impregnated tobacco. *Id.* Liquid ammonia, ammonium hydroxide, and ammonium carbonate or bicarbonate can also be utilized. *Id.* This patent was disclosed to the PTO during prosecution of the applications for the patents in suit. Plaintiffs' exhibit 1, col. 2, lines 63–68; col. 3, lines 1–3; plaintiffs' exhibit 1A, col. 2, lines 50–58; plaintiffs' exhibits 38 and 39.

42. United States Patent Numbers 3,524,451 (Frederickson) and 3,524,452 (Moser), both issued August 18, 1970, and assigned to R.J. Reynolds Tobacco Company, relate to Reynolds' G–13 process. Defendant's exhibits 306 and 307. They teach impregnating tobacco with a volatile organic liquid such as freon or other halogen substituted hydrocarbons for a period of time and then heating with a stream of hot gas to volatize the liquid causing expansion. *Id.* Both of these patents were disclosed to the PTO during prosecution of the applications for the patents in suit. Plaintiffs' exhibit 1, col. 2, lines 44–48; plaintiffs' exhibit 1A, col. 2, lines 31–35; plaintiffs' exhibits 38 and 39.

43. Canadian patent 971,067 (Madures), issued July 15, 1975, and is assigned to Philip Morris. Defendant's exhibit 59. It teaches an expansion process that utilizes nitrous oxide or sulfur dioxide in either liquid or gaseous form as the impregnating agent and then subjecting the impregnated tobacco to heat or to microwave or radiant energy. *Id.* This patent was not only disclosed but a copy of it was given to the PTO during the prosecution of the reissue patents in suit. Plaintiffs' exhibit 697 at 53, 56, 61–70; plaintiffs' exhibit 698 at 50, 52, 58–67; plaintiffs' exhibits 1 and 1A. The Madures patent does not teach the use of liquid carbon dioxide to expand tobacco. Defendant's exhibit 59.

44. The prior art includes a number of patents that relate to expansion of tobacco stems. *E.g.,* United States Patent 3,409,022, invented by Dr. Burde and assigned to Philip Morris (defendant's exhibit 303); United States Patent 3,409,023, invented by Dr. Burde and assigned to Philip Morris (defendant's exhibit 304); United States Patent 3,409,027, invented by Dr. Burde and assigned to Philip Morris (defendant's exhibit 305); United States Patent 3,734,104, invented by William Buchanan, *et al.,* and assigned to Philip Morris (defendant's exhibit 314); and United States Patent 3,425,425, invented by John Hind and assigned to Philip Morris (defendant's exhibit 326). These patents disclose various methods of treating stems such as treating with a solution containing a water soluble carbohydrate (defendant's exhibit 326), moisturizing cut stems (defendant's exhibits 314, 305, 304, 303) and then subjecting the stems to various energy sources including: microwave energy (defendant's exhibit 304), radiant energy (defendant's exhibit 303), heated spreading means utilizing opposing mechanical forces (defendant's exhibit 305), hot gas (defendant's exhibit 314), and hot air current (defendant's exhibit 326). All of these patents relate to expansion of tobacco stems which have a different cellular structure than tobacco lamina or leaf. *See* fact finding 13, *supra.* All of these patents were disclosed to the PTO during prosecution of the applications for the patents in suit. Plaintiffs' exhibit 1, col. 2, lines 8–24; col. 2, lines 49–52; plaintiffs' exhibit 1A, col. 1, line 64—col. 2, lines 1–12; col. 2, lines 36–39.

45. United States Patent 2,656,841 (Gurley), issued October 27, 1953, discloses a process for expanding reconstituted tobacco. Defendant's exhibit 299. It teaches a method for forming a sheet or web from stems, tobacco scrap and dust prior to placing the sheet material on a flame resistant traveling support that is passed through or exposed to a source of intense heat. *Id.* It does not teach the use of liquid carbon dioxide to expand tobacco lamina. *Id.*

46. United States Patent 3,357,436 (Wright), issued December 12, 1967, and assigned to B & W, relates to apparatus for drying tobacco using a closed air drying system containing a high proportion of moisture or water vapor. Defendant's exhibit 302. It does not disclose expansion of tobacco leaf using carbon dioxide. *Id.* Although the Wright patent was not specifi-

cally disclosed to the PTO during prosecution of the applications for the patents in suit, similar types of dryers were disclosed to the PTO as one means for accomplishing the expansion step of the patented process. Plaintiffs' exhibit 1, col. 6, lines 11–23, 51–54; plaintiffs' exhibit 1A, col. 8, lines 39–43; plaintiffs' exhibits 38 and 39.

47. United States Patent 3,223,090 (Strubel), issued December 14, 1965, and assigned to B & W, relates to methods of making reconstituted tobacco products using freeze dry procedures. Defendant's exhibit 325. Freeze drying does not involve use of liquid carbon dioxide. *Id. See also* Trial Vol. III at 270–71. This patent does not teach using heat to expand frozen tobacco. *Id.* Although this particular patent was not disclosed to the PTO, prior art relating to freeze drying tobacco was disclosed to the PTO during prosecution of the applications for the patents in suit. Plaintiffs' exhibit 1, col. 2, lines 53–56; plaintiffs' exhibit 1A, col. 2, lines 40–43; plaintiffs' exhibits 38 and 39.

48. United States Patent 2,759,858 (Baer), issued September 9, 1953, relates to expanding tobacco by means of steam heat in a pressure chamber at a pressure not greater than atmospheric. Defendant's exhibit 329. This patent does not teach use of liquid carbon dioxide and pressures sufficient to maintain $CO_2$ in its liquid form to expand tobacco. *Id.*

49. United States Patent 3,612,066 (Jones, *et al.*), issued October 12, 1971, and assigned to R.J. Reynolds, is a variation on the theme of the G–13 process that involves denicotinizing tobacco by use of an organic liquid solvent and then contacting with hot gas to cause expansion. Defendant's exhibit 310. It does not each use of liquid $CO_2$ to expand tobacco. *Id.* This particular patent was not disclosed to the PTO during prosecution of the patents in suit, although the basic G–13 patents were disclosed to the PTO. *See* fact finding 42, *supra.*

50. United States Patent 3,693,631 (Moore, *et al.*), issued April 28, 1971, and assigned to Reynolds Leasing Corporation, is another variation on the theme of the G–13 process. Defendant's exhibit 313. This patent is an improvement of United States Patent 3,524,452 (defendant's exhibit 307) and teaches a process in which the organic impregnating fluid is applied to the tobacco in vapor state. *Id.* It teaches the use of nonoxygenated compounds, preferably hydrocarbons and halogenated hydrocarbons, as impregnants. *Id.*, col. 3, lines 35–68. It does not teach the use of liquid carbon dioxide to expand tobacco. *Id.* While this particular patent was not disclosed to the PTO during prosecution of the applications for the patents in suit, the basic G–13 patents were disclosed to the PTO. *See* fact finding 42, *supra.*

51. United States Patent 3,529,606, invented by Dr. Burde and assigned to Philip Morris, issued on September 22, 1970. Defendant's exhibit 308. This patent discloses another process for expanding tobacco stems by exposing them to a current of hot air. *Id. See also* defendant's exhibits 303, 304, 305, 314, and 326. It does not teach expansion of tobacco leaf with liquid carbon dioxide. Defendant's exhibit 308. This particular patent was not disclosed to the PTO during prosecution of the applications for the patents in suit; however, several other patents relating to stem expansion were disclosed to the PTO. *See* fact finding 44, *supra.*

52. United Kingdom Patent 1,484,536 (Michals), issued January 29, 1975, and assigned to Airco, is entitled "Method for Expanding Organic Substances." Defendant's exhibit 324. It is the United Kingdom counterpart to Michals' American patent application that was abandoned after Philip Morris was awarded priority of invention. *See* fact findings 16–25, *supra.* This patent does include a step calling for the application of positive heat. Defendant's exhibit 324, claim 1, lines 99–101; claim 11. However, this patent is not prior art to the '013 patent in suit. *See* fact findings 20–22, *supra.* This patent is prior art to the '014 patent in suit, and it was considered and cited as a reference by the PTO during prosecution of the application for the '014 patent and its predecessor. Plaintiffs' exhibit 1A and 39. The PTO deter-

mined that the '014 patent was patentable over this United Kingdom '536 patent. *Id.*

53. Michals work is not prior art to the '013 patent because it failed to expand tobacco and accordingly was not a successful conception and reduction to practice. *E.g.*, defendant's exhibit 350 at 14, 21–22, 24–28; fact findings 16–26, *supra.* The PTO had the information relating to Michals and Burde's work before it when it allowed the claims of the original '073 patent and its reissue, the '013 patent, to issue. *Cf.* defendant's exhibit 54 and defendant's exhibit 333. There is simply no evidence of record suggesting that Examiner Millin, who handled both the Burde and Michals patent applications, was unaware of their competition for priority of invention and its ultimate resolution.

54. The '013 patent is the most relevant prior art to the '014 improvement patent. Plaintiffs' exhibits 1, 1A, 38, 39. The Belgian counterpart to the '013 patent and United Kingdom patent 1,484,536 (defendant's exhibit 324, fact finding 52, *supra* ), and BOC's Belgian patent 825,133 were disclosed to the PTO during prosecution of the application for the '014 improvement patent and its predecessor. Plaintiffs' exhibit 1A, col. 3, lines 33–50; plaintiffs' exhibit 39, col. 3, lines 27–46.

55. Defendant presented no evidence at trial regarding the scope and content of the prior art references discussed at fact findings 35–52, *supra.* Dr. Jewell testified on direct examination that he had read the Reynolds South African patents, but his thoughts on these patents were brought out on cross-examination. *Compare* Trial Vol. VIII at 836 *with* Vol. IX at 929–31.

56. The only prior art references developed into commercial processes for license in the marketplace are the Reynolds patents (defendant's exhibits 306, 307, 310, 313) and their corresponding G–13 and G–13C processes. Trial vol. II at 123; *see* fact findings 31–33, *supra.* The Armstrong patent (defendant's exhibit 316) was developed into a commercial process by Philip Morris and is still in use, but there is no evidence that this ammonium carbonate process is available for commercial license

like DIET is. Trial. Vol. I at 82–83, 90; Vol. II at 113–14, 143–44; Vol. III at 261–62, 275–79.

57. None of the prior art references teach or suggest the use of liquid carbon dioxide in a tobacco expansion process other than United Kingdom patent 1,484,536 (which is not prior art to the '013 patent). Fact findings 35–52, *supra.*

58. None of the prior art references teach or suggest the use of pressures sufficient to maintain carbon dioxide in its liquid form, *i.e.*, pressures from about 230 to 915 p.s.i.g. Fact findings 35–51, *supra.* The Madures patent teaches the expansion of tobacco with nitrous oxide or sulfur dioxide in gaseous or liquid form, but high pressures are not emphasized, and this reference does not teach using liquid $CO_2$ as an expansion agent. Defendant's exhibit 59, fact finding 43, *supra.*

59. None of the prior art references teach or suggest reduction of pressure to convert the liquid $CO_2$ impregnant into a solid $CO_2$ impregnant. Fact findings 35–51, *supra; cf.* findings 52–53, *supra.*

60. None of the prior art references teach or suggest the formation of dry ice or solid $CO_2$ in and on the tobacco as a step in an expansion process. Fact findings 35–51, *supra; cf.* findings 52–53, *supra.*

61. None of the prior art references teach or suggest the step of applying positive heat to frozen tobacco to achieve expansion. Fact findings 35–51, *supra; cf.* findings 52–53, *supra.*

62. None of the prior art references teach or suggest the process steps of the '014 patent in suit, *i.e.*, raising input moisture levels while reducing pressure levels to achieve good expansion results. Fact findings 9–12, 35–51, *supra; cf.* findings 52–53, *supra.*

63. Reynolds Leasing Corporation, a corporate affiliate of R.J. Reynolds Tobacco Company, filed suit (Civil Action No. C–81–1111R, E.D.Va.) (the "*Reynolds* litigation") against Philip Morris and Airco in 1981 alleging that the DIET process infringed their G–13 patents: United States

patent 3,524,452 (defendant's exhibit 307) and United States patent Re. 30,693, a reissue of United States Patent 3,524,451 (defendant's exhibit 306). Plaintiffs' exhibit 697 at 54 n. 2; plaintiffs' exhibit 698 at 51 n. 2. This action ultimately settled with Reynolds conceding that the DIET process or any other process employing carbon dioxide as an impregnant did not infringe the G–13 patents in suit. Plaintiffs' exhibit 30; trial Vol. II at 118–120.

64. During the course of discovery in the *Reynolds* action, plaintiffs learned that Reynolds scientists had done some in-house, experimental work with liquid carbon dioxide in 1971–72. *E.g.*, plaintiffs' exhibits 701–705, 707–711; plaintiffs' exhibit 698 at 55; plaintiffs' exhibit 697 at 59.

65. Philip Morris disclosed the fact of the *Reynolds* litigation and its settlement to the PTO in the prosecution of the applications for the reissue patents in suit. Plaintiffs' exhibit 697 at 54 n. 2; plaintiffs' exhibit 698 at 51 n. 2. Philip Morris also disclosed the fact that Reynolds had done some work with liquid $CO_2$ stating that the work was not prior art because it had been abandoned, suppressed and concealed. Plaintiffs' exhibit 697 at 59; plaintiffs' exhibit 698 at 55–56.

66. An examination of plaintiffs' exhibits 701–705, 707–711 discloses that Mr. Rice, a Reynolds scientist, expanded tobacco using liquid carbon dioxide and high pressures in 1971–72. However, Reynolds' internal feasibility studies concluded that using $CO_2$ as an expansion agent was not commercially feasible when compared to the G–13 process because of the high pressures involved and substantial research and development work necessary to develop a working system. *E.g.*, plaintiffs' exhibit 702 at 55; plaintiffs' exhibit 703 at 109, 187–88; plaintiffs' exhibit 704 at 43; plaintiffs' exhibits 707, 710, 711.

67. The Reynolds work was abandoned, suppressed, and concealed since it was never commercialized, never publicized outside the company, and no patent applications were ever filed claiming this work as an invention. Plaintiffs' exhibit 702 at 55, 57; plaintiffs' exhibit 703 at 107; plaintiffs'

exhibit 704 at 47; plaintiffs' exhibit 711. Therefore, this work is not prior art. Nor does this experimental, in-house liquid $CO_2$ work bear any relationship to the Reynolds South African patents, since those patents were filed on December 8, 1970, before Mr. Rice began his experiments in early 1971. *Compare* plaintiffs' exhibits 703, 705, 709 at RA03139, 710 *with* defendant's exhibits 253 and 254. Mr. Frederickson, one of the inventors on the South African patents, stated on deposition in the *Reynolds* litigation that he did not work on Mr. Rice's liquid $CO_2$ project and knew nothing about Rice's work until it was completed. Plaintiffs' exhibit 701 at 1159–60.

68. The Reynolds work—using liquid carbon dioxide at high pressures to expand tobacco—would be material to a reasonable examiner. However, Philip Morris told the PTO during the reissue proceedings that the relevant Reynolds reports were not being submitted because they were still subject to a protective order and offered to seek to remove them from the protective order should the Examiner wish to see them. Plaintiffs' exhibit 697 at 59; plaintiffs' exhibit 698 at 56. This offer to procure the Reynolds reports should the Examiner wish to see them negates any finding of deceptive intent or intent to mislead the PTO with respect to Reynolds abandoned liquid $CO_2$ work.

69. The person of ordinary skill in the art would be one skilled in the science of tobacco technology, having knowledge of and experience with the chemical and physical properties of tobacco. The person should have at least a bachelor's degree in science and/or engineering, specifically chemistry, physics, and chemical engineering, as well as several years of practical experience. However, such person can acquire the necessary skills by means of actual, hands-on experience as Mr. Lloyd and Mr. Aument demonstrate. *See, e.g.,* Trial Vol. I at 78; Vol. II at 139–40; Vol. III at 207, 252; Vol. IV at 301; Vol. VII at 620; Vol. VIII at 794; Vol. X at 935; Vol. XII at 1301–02; Korte deposition at 4; Aument deposition at 3; Strubel deposition at 12–13.

70. BOC has licensed the inventions of the patents in suit to BATCO, American Brands and Rothmans International in exchange for royalties. Trial Vol. I at 90; Vol. V at 442; plaintiffs' exhibits 14, 652, 653. Philip Morris has DIET plants in the United States, Canada, Germany, Switzerland, and Holland. Trial Vol. I at 89. The BAT family of companies has DIET facilities in the United Kingdom, Germany, Malaysia, and the United States, and intends to have an operational plant in Brazil in 1987. Trial Vol. VIII at 780; Willis deposition at 192–93.

71. Philip Morris has received approximately $3 million dollars in patent royalties and another $1.5 million in know-how fees from licensing the DIET technology to other companies. Trial Vol. I at 90.

72. Philip Morris spent approximately $16 million dollars on research and development of the DIET technology and approximately $26 million dollars on its first commercial DIET plant in Richmond, Virginia. Trial Vol. I at 88. Philip Morris' total expenditure on research and development including construction of its first DIET plant was approximately $42 million dollars. *Id.*

73. Philip Morris' Richmond DIET plant has expanded roughly 200 million pounds of tobacco from 1979 to date of trial (November, 1985) at a cost savings of approximately $300 million dollars. Trial Vol. I at 91–92.

74. B & W first learned of the DIET expansion process when it was publicized in industry trade publications in October, 1976. Trial Vol. VII at 623; plaintiffs' exhibit 47; Strubel deposition at 46. BATCO first became interested in the DIET process in 1976 as a result of BOC personnel contacting Dr. Greene, the Research Director at BATCO. Trial Vol. VIII at 721.

75. B & W was interested in expanding tobacco. Trial Vol. VII at 624.

76. B & W had done no work with liquid carbon dioxide tobacco expansion before learning of the DIET process from BOC. Trial Vol. III at 233–34, 245. B & W began some work using liquid $CO_2$ as an extraction agent in November-December, 1976.

Plaintiffs' exhibit 46; Strubel deposition at 82–83. This liquid $CO_2$ extraction work was never commercialized. Stubel deposition at 84. Dr. Jewell testified on deposition that he recalled no $CO_2$ extraction or expansion work at B & W before B & W learned of the DIET process from BOC. Jewell deposition at 327–32.

77. B & W obtained copies of the British and German counterparts to Philip Morris' and BOC's United States patent applications by January, 1977. Plaintiffs' exhibits 43, 44, 45; Strubel deposition at 56–57. Mr. Steiner of B & W was able to expand tobacco using liquid $CO_2$ in early 1978 based on B & W's knowledge at that time which included the foreign patents. Trial Vol. VIII at 812; Strubel deposition at 209–10. B & W was able to practice the invention of the patents in suit. *Id.*

78. B. & W had a fairly good idea of what BOC and Philip Morris had filed in the United States Patent and Trademark Office. Strubel deposition at 56–57; fact finding 77, *supra.*

79. Dr. Jewell, B & W's designated corporate representative, testified at trial that he did not think frozen tobacco could be expanded before learning of the DIET process. Trial Vol. III at 230–31. Other B & W workers shared Dr. Jewell's belief. Korte deposition at 39. Dr. Jewell further testified that he had not thought of expanding tobacco with liquid $CO_2$ before learning of DIET. Trial Vol. III at 233.

80. Normal pressures employed in the tobacco processing industry were about 25 to 30 p.s.i.g. before the DIET process. Trial Vol. III at 231; Jewell deposition at 731–32.

81. B & W had no in-house, high order expansion process of its own before learning of DIET. Trial Vol. III at 234, Vol. VII at 693. B & W looked at G–13, freeze drying, liquid nitrogen, and carbonated water expansion techniques and ultimately rejected them in favor of DIET. Trial Vol. VII at 691–93; Strubel deposition at 82–84.

82. B & W's workers had knowledge of the elements of the DIET process such as

use of pressure vessels, hot air ovens, and liquid $CO_2$ but did not put these elements together to expand tobacco before learning of the DIET process from BOC. Jewell deposition at 334–36; Strubel deposition at 250; Korte deposition at 137.

83. Both B & W's and Philip Morris' witnesses testified that one of ordinary skill in the art reading the '013 patent in suit and following its steps would get expanded tobacco. *Compare* Trial Vol. IV at 310–11 *with* Korte deposition at 299. Likewise, one following the steps of the know-how package would get expanded tobacco. Korte deposition at 355.

84. Before learning of the improved process of the '014 patent in suit, B & W's workers thought that using low temperatures (liquid $CO_2$ at 400 p.s.i.g. is below 32° F, the freezing point of water) would not result in good impregnation and was contra-indicated. Plaintiffs' exhibit 535; Korte deposition at 156–61.

85. Before learning of the improved process of the '014 patent in suit, B & W's workers thought that raising tobacco's input moisture would correspondingly diminish its ability to absorb liquid $CO_2$ thereby decreasing expansion. Trial Vol. VIII at 835, Vol. IX at 848; plaintiffs' exhibit 535; Korte deposition at 161.

86. The '014 improvement process teaches raising input moisture levels of tobacco as well as using liquid $CO_2$ at a temperature below 32° F to achieve good expansion. Plaintiffs' exhibit 1A; fact finding 12, *supra.*

87. B & W saves approximately $18 million dollars a year through its use of a liquid carbon dioxide tobacco expansion process in its Macon, Georgia facility. Trial Vol. VII at 696; plaintiffs' exhibit 688.

88. B & W had expanded approximately 26 million pounds of tobacco in its Macon, Georgia facility through July, 1985. Trial Vol. V at 483; plaintiffs' exhibit 688.

89. B & W's Macon liquid $CO_2$ expanded tobacco process is a commercial success. Trial Vol. VII at 700.

90. Philip Morris' liquid $CO_2$ tobacco expansion process is a commercial success. Fact findings 70–73, *supra.*

91. The DIET process satisfied a perceived need in the tobacco industry for a process that would expand tobacco lamina without leaving any discernible foreign residue in it. Fact findings 31–34, *supra.*

*Infringement*

92. B & W's liquid $CO_2$ tobacco expansion process was called DIET until Dr. Hughes, then B & W's president, ordered the name changed in early 1984 to MET, an acronym for Macon Expanded Tobacco. Trial Vol. VII at 671–72. The notebooks in B & W's control room are still marked DIET, but MET labels have been placed over the DIET labels. Trial Vol. IV at 308; Vol. VII at 617.

93. B & W's MET process operates in the following manner:

(a) cut tobacco is moisturized up to about 25% water and loaded into a wire basket in 400–450 pound batches;

(b) the basket is placed on a trolley handling system which takes it into the impregnation area where a computerized turntable directs the basket to the proper impregnator or pressure vessel;

(c) the basket is placed in the impregnator which is closed, locked, and sealed off from atmosphere;

(d) all the air is purged out of the impregnator and replaced with $CO_2$ gas;

(e) the impregnator is pressurized with gaseous $CO_2$ to approximately 400 p.s.i.g. and holds for approximately 73 seconds;

(f) liquid $CO_2$ is then introduced until it covers or submerges the tobacco which takes approximately 83 seconds;

(g) then, all the liquid $CO_2$ that is not somehow retained by the tobacco is pumped out of the impregnator (about 104 seconds) while the pressure remains at 400 p.s.i.g. and a 3 minute draining period is observed;

(h) next, the pressure in the impregnator is reduced to atmosphere during which time the remaining liquid $CO_2$ retained by

the tobacco flashes off and is converted to dry ice;

(i) the impregnator is then unlocked, and the basket with its mass of frozen tobacco is removed and the mass dumped into a device called a clumpbreaker which breaks it down into smaller lumps;

(j) the smaller lumps of tobacco are fed across conveyors into the expander, a high velocity stream of hot gas, where the tobacco is expanded in approximately .05 seconds;

(k) the tobacco is discharged from the expander through a separator at a moisture content of 9–10% and taken by conveyor to reordering where additional moisture is added as needed;

(l) finally, the tobacco is placed in product storage coffers, and is available for manufacture. Trial Vol. IV at 322–23; Vol. VII at 562–81, 596–97; Vol. VIII at 802–05.

94. B & W's apparatus for accomplishing the MET process consists of the following:

(a) pressure vessels that serve as impregnators where tobacco is contacted with liquid and gaseous $CO_2$ under pressure;

(b) a trolley system and basket handling system that convey wire baskets loaded with tobacco through the process steps including introducing and withdrawing the baskets from the impregnators;

(c) a $CO_2$ handling system consisting of pipes, duct work, and valves that pump in liquid $CO_2$ from large, outside holding tanks into a receiver vessel in the impregnation area;

(d) additional pipes, valves, and duct work which introduce gaseous $CO_2$ into the impregnator and pressurize it and thereafter introduce liquid $CO_2$ at predetermined temperatures and pressures into the impregnator and later withdraw any excess liquid after the impregnation step;

(e) a gas recovery system consisting of two compressors that recover $CO_2$ gas after the impregnation cycle;

(f) a device called a clump breaker that breaks the mass of frozen tobacco down into smaller lumps;

(g) a device called an expander consisting of an enclosed, high velocity stream of hot gas (about 650° F) that expands the tobacco;

(h) a reordering cylinder where additional moisture is added as a last step before storage. Trial Vol. IV at 313–14; Vol. VII at 562–81; Vol. VIII at 814, 816–17.

95. Plaintiffs' expert in tobacco technology, Mr. W.G. Lloyd (Joe), testified that it was his opinion that B & W infringes claims 1, 16, 5, 17, 18, 20, 27, 30, 22, 23, 24 and 26 of the '073 patent and '013 reissue patent in suit. Trial Vol. IV at 305–22.

96. Mr. Lloyd further testified that in his opinion B & W infringes claims 1, 2, 7 and 9 of the '814 patent and the '014 reissue patent in suit. Trial Vol. IV at 323–34.

97. Claim 1, the broad process claim of the '013 patent is reproduced at fact finding 8, *supra*. Claim 5 is an apparatus claim and reads as follows:

5. Apparatus for expanding tobacco which comprises a pressure vessel,

means for introducing and withdrawing tobacco from said pressure vessel,

means for introducing liquid carbon dioxide into said pressure vessel to impregnate said tobacco therewith,

means for withdrawing said liquid carbon dioxide from said pressure vessel, following impregnating of said tobacco,

means for maintaining said carbon dioxide at predetermined temperature and pressure in said pressure vessel whereby it remains in liquid state,

means for converting the liquid carbon dioxide impregnating said tobacco to solid carbon dioxide, and

means for vaporizing the solid carbon dioxide impregnating said tobacco to effect expansion of said tobacco.

Plaintiffs' exhibit 1, col. 13, lines 32–51.

98. Claim 16 of the '013 patent is a method claim and reads as follows:

16. The method of expanding tobacco which comprises the steps of (1) impregnating the tobacco with liquid carbon di-

oxide under conditions such that substantially all of the liquid carbon dioxide is maintained in liquid form to impregnate the tobacco with the liquid carbon dioxide, (2) subjecting the liquid carbon dioxide-impregnated tobacco to conditions such that the liquid carbon dioxide is converted to solid carbon dioxide and (3) thereafter subjecting the solid carbon dioxide-containing tobacco to conditions whereby the solid carbon dioxide is vaporized to cause expansion of the tobacco.

Plaintiffs' exhibit 1, col. 14, lines 31–41.

99. Claim 17 of the '013 patent is an apparatus claim which specifies operational pressures and reads as follows:

17. Apparatus for expanding tobacco which comprises a pressure vessel,

means for introducing and withdrawing tobacco· from said pressure vessel;

means for introducing liquid carbon dioxide into said pressure vessel to impregnate said tobacco therewith,

means for withdrawing said liquid carbon dioxide from said pressure vessel, following impregnating of said tobacco,

means for maintaining said carbon dioxide at predetermined temperature and at a pressure approximately between 230 and 915 p.s.i.a. in said pressure vessel whereby it remains in liquid state;

means for converting the liquid carbon dioxide impregnating said tobacco to solid carbon dioxide, and

means for vaporizing the solid carbon dioxide impregnating said tobacco to effect expansion of said tobacco.

Plaintiffs' exhibit 1, col. 14, lines 42–61.

100. Claims 1 and 2 of the '014 patent disclose an improved process and are reproduced at fact finding 11, *supra*.

101. Defendant's expert, Dr. Dean Harper, has a Ph.D. in chemical engineering but no tobacco experience. Trial Vol. X at 935, 939. Dr. Harper testified that in his opinion the MET process does not infringe claims 16, 17, and 18 of the '013 patent because the patent speaks in terms of liquid $CO_2$ impregnation and conversion to solid $CO_2$, and it is his opinion that gaseous impregnation takes place in the MET pro-

cess, not liquid. *Id.* at 995–1001. Dr. Harper also stated his opinion that claim 17 is not infringed because expansion in the MET process does not take place in the pressure vessel but rather in a separate piece of equipment. *Id.* at 998.

102. Dr. Harper further testified that in his opinion claim 1 of the '014 patent is not practiced by B & W because no liquid $CO_2$ impregnation and conversion to solid $CO_2$ occurs, and MET tobacco has an exit moisture content level of 9–10% instead of the 6% specified by the claim. Trial Vol. X at 1001–02.

103. On January 22, 1985, Dr. John Jewell testified on deposition that B & W practices all three steps specified in claim 16 of the '013's predecessor patent in its Macon expanded tobacco process. Jewell deposition at 221–22.

104. Dr. Jewell further testified that B & W's Macon plant contained all the apparatus and means for expanding tobacco specified in claim 17 of the '013's predecessor patent. *Id.* at 222–23.

105. The next day Dr. Jewell testified that his understanding of the claimed language had changed since he gave his previous answers and essentially recanted his prior testimony. *Id.* at 392–98. Dr. Jewell admitted he had talked to his lawyers about his testimony in the interim. *Id.* at 393.

106. Dr. Jewell testified on deposition that he saw the patents in suit shortly after they issued, read them, and discussed his understanding of what the claims said with Dr. Sanford and Mr. Lamb of B & W. *Id.* at 209–11, 218–19. Thus Dr. Jewell must have had some understanding of what the patent claims said before his testimony admitting infringement.

107. B & W's MET process has operated in substantially the same fashion from the time of pre-trial discovery until trial. Trial Vol. VII at 592.

108. Neither the inventors of the inventions of the patents in suit nor their counsel have ever attempted to limit the claims of the DIET patents or their commercial

process to any specific mechanism or theory of operation. *E.g.*, Trial Vol. II at 159, 167–68; Vol. IV at 310–11; Vol. XII at 1279–80, 1292–93; plaintiffs' exhibit 1, col. 5, lines 25–26; plaintiffs' exhibit 697 at 150, 164; plaintiffs' exhibit 698 at 147–48.

109. B & W's primary basis for non-infringement is its theory that the MET process operates with gaseous $CO_2$ impregnation, not liquid $CO_2$ impregnation as required by the '013 and '014 patents. Trial Vol. VII at 596–97; Vol. VIII at 803–04; Vol. X at 991–92, 995–1000. It is Dr. Harper's opinion that gaseous $CO_2$ impregnates the tobacco and liquid $CO_2$ does not; therefore there is no liquid $CO_2$ inside the tobacco to convert into solid $CO_2$ and no solid $CO_2$ to vaporize causing expansion. Trial Vol. X at 995–96. Instead, water in the tobacco picks up the gaseous $CO_2$ forming carbonated water and a $CO_2$ water hydrate.[4] Trial Vol. VII at 596. The tests upon which Dr. Harper bases his opinion were initiated October 10, 1985. Trial Vol. X at 943–44. Trial of this case commenced October 28, 1985. Trial Vol. I at 1.

110. Defendant's gas theory bears a striking resemblance to the Whidby report. Plaintiffs' exhibit 693. Dr. Jerry Whidby, a Philip Morris scientist, conducted a "Study of the Interaction of $CO_2$ with the Tobacco-Water Maxtrix" dated March 14, 1984, which concluded that $CO_2$ reacts with the inorganic water in tobacco to form a stable compound system which decomposes upon heating and releases $CO_2$ gas which expands the tobacco. *Id.* Dr. Jewell and Dr. Harper read the Whidby report. Trial Vol. IX at 887–88; Vol. X at 1003–04, 1011–12.

111. Plaintiffs' witnesses testified that both gaseous and liquid $CO_2$ impregnation occur in the DIET process forming both solid $CO_2$ and a $CO_2$ water hydrate inside the tobacco cells. Trial Vol. II at 176–77; Vol. IV at 311, 334–35; Vol. V at 362–63; Vol. XII at 1279–80, 1341–42.

112. The evidence is undisputed that if one skilled in the art of tobacco technology follows the steps of claim 1 of the '013

patent, he will get expanded tobacco regardless of any theory of operation. *E.g.*, Trial Vol. II at 176; Vol. IV at 310–11; Korte deposition at 299; fact finding 83, *supra*.

113. B & W's current tobacco expansion process will not work without the liquid $CO_2$ step. Trial Vol. VII at 593–94; Vol. IX at 916; Vol. X at 1064; Vol. XI at 1087–88.

114. B & W built a liquid $CO_2$ tobacco expansion plant, operated it, and expanded tobacco with it for almost three years before perceiving the gaseous impregnation theory. Trial Vol. IX at 931; *see also* fact finding 151, *infra*.

115. The precise mechanism by which the inventions of the patents in suit work is immaterial since practicing the process steps yields expanded tobacco. *See* fact findings 108–114, *supra*.

116. The '013 patent teaches that the impregnation step should be performed under such conditions that the unbound water in the tobacco is not frozen after contact with liquid $CO_2$ to insure adequate penetration by the liquid $CO_2$ and suggests maintaining the tobacco at a temperature between $-2°$ C and $31°$ C. Plaintiffs' exhibit 1, col. 5, lines 25–46; col. 12, lines 51–53; plaintiffs' exhibit 38, col. 5, lines 20–41; col. 12, lines 44–46; Trial Vol. IV at 306–07.

117. B & W operates its MET tobacco expansion process in such a manner that the water in the tobacco is not frozen before the impregnation step occurs. Trial Vol. IV at 306–07; Vol. IX at 857; *cf.* Vol. X at 970.

118. The '013 patent teaches that the process should be performed under conditions such that substantially all of the liquid carbon dioxide is maintained in liquid form during contact with the tobacco in the impregnation step. Plaintiffs' exhibit 1, col. 12, lines 53–55; col. 14, lines 33–36.

119. B & W's MET process operates in such a fashion that substantially all of the liquid $CO_2$ introduced during the impregna-

---

**4.** A "hydrate" is a compound or complex ion formed by the union of water with some other

substance. M. Webster, *New Collegiate Dictionary* (7th ed. 1965).

tion step is maintained in liquid form. Trial Vol. IV at 307–08; Vol. VII at 570–71.

120. The '013 patent teaches expanding the impregnated tobacco by subjecting it to heat or its equivalent in order to vaporize the solid $CO_2$ impregnant. Plaintiffs' exhibit 1, col. 6, lines 3–8; *cf.* col. 12, lines 58–61; col. 13, lines 49–51; col. 14, lines 39–41; col. 14, lines 59–61.

121. B & W's MET process expands the impregnated tobacco by heating it thereby vaporizing the solid $CO_2$, $CO_2$ water hydrate and whatever else might be inside the tobacco cells. Trial Vol. IV at 310–11; Vol. VII at 578–79, 610.

122. The '014 improvement patent discloses and claims an improvement to the basic process of the '013 patent. Plaintiffs' exhibit 1A, col. 3, lines 33–52; plaintiffs' exhibit 39, col. 3, lines 27–46; *see also* fact finding 10, *supra.*

123. Claim 1 of the '014 patent teaches an improvement in which tobacco with an input OV content of from about 17 to 30% is subjected to pressure in the range of about 250 p.s.i.g. to 450 p.s.i.g. during the impregnation step. Plaintiffs' exhibit 1A, col. 13, lines 8–12. Claim 2 of the '014 patent also teaches a method of expanding tobacco in which the impregnation step is conducted at pressures from about 350 to 450 p.s.i.g. and the tobacco has an input OV content of from about 17 to about 25%. Plaintiffs' exhibit 1A, col. 13, lines 16–20.

124. B & W's MET process utilizes tobacco having an input OV content of about 25% and operates the impregnation step at approximately 400 p.s.i.g. Trial Vol. IV at 316, 325–26; Vol. VII at 596, 614; Vol. VIII at 818–19; Vol. X at 969, 1002.

125. Claim 1 of the '014 patent further specifies conducting the expansion step in such a manner that the moisture content of the expanded tobacco obtained from the third step is no higher than about 6%. Plaintiffs' exhibit 1A, col. 13, lines 13–15; plaintiffs' exhibit 39, col. 14, lines 1–3.

126. B & W's MET process obtained exit moistures, as measured by B & W's method, below about 6% until after this lawsuit was filed. Trial Vol. III at 246–47; Vol. VII at 616.

127. B & W's MET process currently achieves exit moisture levels of about 9–10%. Trial Vol. VII at 579–80, 616; Vol. VIII at 805; Vol. X at 1002. However, B & W's method of measuring moisture or OV content gives a higher reading than the method specified by the '014 patent. *See* fact findings 14–15, *supra.*

128. B & W's alteration of one element of the '014 patent claims, *i.e.,* raising exit moisture OV levels from about 6% to 9–10%, does not alter the fact that the MET process still performs substantially the same function in substantially the same way to obtain the same result—expanded tobacco—as the improved process claimed in claims 1 and 2 of the '014 patent. Fact findings 122–27, *supra.* B & W copied the invention of the '014 patent in suit. *Id.*

129. Examiner Millin, during the reissue proceedings, concluded that the critical limitation of the claimed inventions was impregnation of tobacco with liquid $CO_2$. Plaintiffs' exhibit 697 at 154–55; plaintiffs' exhibit 698 at 143–44. The applicants therefore amended their claims to recite liquid impregnation, and the reissue applications issued as the patents in suit. Plaintiffs' exhibit 697 at 164, 1; plaintiffs' exhibit 698 at 148, 1.

130. Tobacco placed in liquid $CO_2$ will float because its density is less than the density of the fluid in which it is immersed. However, if tobacco were penetrated or impregnated by liquid $CO_2$ it would sink—not float. Trial Vol. XI at 1091–93.

131. Mr. Schardt, patent attorney for Philip Morris, testified that he observed two experiments where tobacco was placed in a pressure vessel with two glass windows on the side, the vessel was pressurized with $CO_2$ gas to 400 p.s.i.g., and liquid $CO_2$ was then introduced until it covered the tobacco, about three quarters of the way up the glass. Trial Vol. XII at 1262–63. The tobacco did not float in liquid $CO_2$; it just lay there on the bottom. *Id.* at 1263–64, 1297–99.

132. B & W's corporate representative, Dr. Jewell, testified that he has never seen tobacco floating in liquid $CO_2$ at 400 p.s.i.g. Trial Vol. IX at 929.

133. Dr. Harper testified that none of the tests he performed prove that there is no solid $CO_2$ in the tobacco cells except for the differential scanning calorimeter (DSC) test. Trial Vol. X at 1019–21. The DSC test showed no transition at −110° F as it should have because $CO_2$ undergoes a phase change at −110° F as it sublimes from a solid (dry ice) to gas. *Id.* at 1020, *cf.* Vol. IX at 871–73. The failure of the DSC test to show a transition at −110° F casts doubt on its reliability.

134. Dr. Harper testified that he had no evidence that no liquid $CO_2$ enters the tobacco cells. Trial Vol. X at 1022.

135. Dr. Harper further testified that he had no positive evidence that there is no solid $CO_2$ inside the tobacco cells. Trial Vol. XI at 1122–23.

136. Tobacco is a good insulator. Trial Vol. X at 1037–39, Vol. XI at 1133. Dr. Harper stated that because of tobacco's insulating characteristics, solid $CO_2$ could exist inside the tobacco while the temperature outside the tobacco measured −34° F. Trial Vol. X at 1041–42; Vol. XI at 1134.

137. Archimedes principle states that "when any material is placed in a fluid its apparent weight decreases by an amount that is equal to the weight of the fluid displaced." Plaintiffs' exhibit 683. Archimedes principle applies to tobacco. Trial Vol. XI at 1126.

138. Plaintiffs' Archimedes experiment (plaintiffs' exhibits 684, 687) was designed to measure the apparent weight of a stainless steel basket of tobacco in air and in liquid $CO_2$ to determine whether liquid $CO_2$ penetrated the tobacco. Trial Vol. XII at 1306. Mr. Lilly, Philip Morris' corporate representative, testified that if liquid $CO_2$ penetrated the tobacco cells, the calculated apparent weight of the basket plus tobacco would be 572 grams. *Id.* at 1313. The actual experimental weight of the basket plus tobacco measured in plaintiffs' Archimedes experiment was 569 grams. *Id.* at 1314.

139. The Archimedes experiment demonstrates that liquid $CO_2$ penetrates the tobacco cells. Trial Vol. XII at 1315. The experiment Mr. Schardt described where tobacco submerged in liquid $CO_2$ did not float demonstrates likewise. Fact findings 130–131, *supra; cf.* finding 132.

140. Mr. Lilly testified that the liquid $CO_2$ inside the tobacco cells is converted to solid $CO_2$ and a $CO_2$ water hydrate after impregnation and reduction of pressure from 400 p.s.i.g. to atmosphere. Trial Vol. XII at 1316–18.

141. Dr. Harper performed a series of tests at B & W's plant the evening before the last day of trial that showed approximately 4.5% $CO_2$ retained by samples of free-fall MET tobacco taken from the expander's inlet and measured both before and after allowing the $CO_2$ to sublime off for 1¾ hours in order to calculate $CO_2$ retention inside the tobacco. Trial Vol. XII at 1237–39. The experts agreed that Dr. Whidby's work demonstrates that $CO_2$ contacts with the free, unbound water in tobacco at 25% OV to form approximately 2.5% $CO_2$ water hydrate. Trial Vol. IX at 890–92; Vol. X at 1018; Vol. XII at 1316–17, 1339. Possibly .6 or .7% $CO_2$ dissolves in the water in the tobacco to form carbonated water. Trial Vol. XII at 1339–40, 1343–44. This leaves 1.3% solid $CO_2$ in, on and around the tobacco. Trial Vol. XII at 1344; *cf.* Vol. X at 1018, 1026; *see also* Vol. XI at 1118–19.

142. Mr. Strubel, B & W's manager of patents and licensing and an engineer, testified on deposition that the basis for the improvements in B & W's Macon expanded tobacco process started out with the knowledge acquired from Philip Morris and BOC. Strubel deposition at 274–76.

143. B & W redesigned its expander or dryer by changing the feed position entry into it and creating a one chamber expander. Trial Vol. VII at 578–79; Vol. VII at 816–17. However, this expander is still a pneumatic conveying dryer with a high steam concentration. Trial Vol. VII at 610; *cf.* plaintiffs' exhibit 1, col. 6, lines 3–28, 51–68.

**1458**

144. B & W was aware of the interference proceedings between Philip Morris and BOC as early as January, 1977. Plaintiffs' exhibit 45. B & W had a fairly good idea of what plaintiffs' patent applications contained since B & W had obtained copies of foreign DIET patents. *See* fact findings 77–78, *supra.*

145. When the basic DIET patent finally issued in the United States, Dr. Sanford, then B & W's vice-president of research and development, advised upper management that they would evaluate the strength of the patents and "weigh our alternatives when they pick us up on the Macon unit." Plaintiffs' exhibit 257.

146. B & W accrued DIET royalties in case the obligation to pay royalties ever became a necessity. Trial Vol. VII at 674–75, 709–10. As of July, 1985, these accrued royalties amounted to a total of $1,662,-420.00. Plaintiffs' exhibit 688 at 3–4.

147. Dr. Jewell and Mr. Kevin Korte, both B & W employees, have filed a patent application, serial number 634,926, in the PTO for an improved tobacco expansion process that describes the claimed invention in precisely the same terms as the patents in suit, *i.e.*, in terms of a liquid $CO_2$ impregnation process. *Compare* plaintiffs' exhibit 360 *with* plaintiffs' exhibits 1 and 1A. This patent application describes and claims B & W's Macon expanded tobacco process which has not changed since the application was filed July 26, 1984. Korte deposition at 370–71.

148. B & W personnel prepared a schematic diagram of its expansion plant and equipment arrangement and annotated it with the numbers of BOC and Philip Morris patents, including the Markwood patent. Plaintiffs' exhibit 333. The Markwood patent, United States Patent Number 4,165,-012 issued August 21, 1979, and assigned to Philip Morris, discloses a design for a cylindrical pressure vessel or impregnator. Plaintiffs' exhibit 331.

149. As early as January 18, 1979, B & W's internal correspondence comparing DIET with G–13 noted that DIET's royalties were less than G–13. Plaintiffs' exhibit 276. This same memo indicates that B &

W was already contemplating its eventual decision not to pay royalties as follows:

In the latter case [DIET], there is an even more favorable aspect, an additional, almost two million dollar annual possibility exists if:

1. No U.S. patent issues on the DIET process.

2. B & W decides to challenge the weak patent they may obtain.

*Id.* at 2.

150. BATCO's patent counsel, Mr. K.H.J. MacLean, concluded in September, 1977, that he could not agree with Mr. Mason, B & W's patent counsel at that time, that there was any strong reason to doubt the validity of Airco's or Philip Morris' patents. Plaintiffs' exhibit 692, *cf.* Trial Vol. VIII at 782–83.

151. B & W received four opinion letters from outside patent counsel regarding the validity of the patents in suit. Defendant's exhibits 247, 344, 345, 346. Only the last two letters, dated August 23, 1983, and November 4, 1983, express the opinion that the patents in suit are invalid for obviousness and that no valid claims would be infringed by the MET process. Defendant's exhibits 346, 247; *cf.* Trial Vol. VII at 706–08, 711–13. B & W's Macon expanded tobacco plant began operating in December, 1982, and reached commercial scale in early 1983, before receipt of these letters. Trial Vol. VII at 657, 706–07; Vol. VIII at 818; plaintiffs' exhibit 475.

152. The evidence is overwhelming that B & W took a calculated, business risk in challenging the patents in suit. B & W's infringement of these patents is willful and deliberate. Fact findings 144–151, *supra.*

153. In the *Reynolds* litigation (fact finding 63, *supra*), plaintiffs emphasized the theory of expansion found in the Whidby report as a basis of noninfringement. *E.g.*, defendant's exhibits 119, 260, 264, 273, 274. Dr. Whidby's study concluded that carbon dioxide reacts with the inorganic water present in tobacco to form a stable $CO_2$ water compound which decomposes upon heating and releases $CO_2$ gas causing

expansion. Plaintiffs' exhibit 693; fact finding 110, *supra*.

154. Mr. Thomas Mullen, a Philip Morris engineer called by Reynolds as an adverse witness, testified that before April of 1983, his understanding was there were two possibilities as to what caused expansion in the DIET process: dry ice and a $CO_2$ water hydrate compound. Defendant's exhibits 271 at 898; 273 at 1190. Mr. Mullen also testified that he was sure liquid $CO_2$ entered the tobacco cells while continuing to emphasize the Whidby theory of expansion. *Id.* at 1184. However, Mr. Mullen ultimately stated that expansion may be caused partially by the sublimation or vaporization of solid $CO_2$ and partially by the presence of a $CO_2$ water compound that decomposes to generate $CO_2$ gas. *Id.* at 1191–92. Mr. Mullen's knowledge of the water–$CO_2$ compound or hydrate was derived from the Whidby report. Defendant's exhibit 274 at 1301.

155. Mr. Mullen's testimony in the *Reynolds* litigation, although emphasizing the Whidby theory of expansion, corresponds with the testimony of plaintiffs' witnesses in this action. Fact finding 111, *supra*. Plaintiffs' witnesses have candidly stated that both solid $CO_2$ and a $CO_2$ water hydrate form inside the tobacco cells in the DIET process. *Id.* Plaintiffs have consistently told this court and the PTO that they have not tried to limit the claims of the DIET process to any specific theory of operation. Fact finding 108, *supra*.

156. The Whidby report was disclosed to the PTO and a copy of same provided to the PTO during the prosecution of the applications for the reissue patents in suit. Plaintiffs' exhibit 697 at 71–115; plaintiffs' exhibit 698 at 68–112.

157. Plaintiffs informed the PTO of the fact of the *Reynolds* litigation and its settlement during prosecution of the applications for the reissue patents in suit. Fact finding 65, *supra*. Plaintiffs did not furnish copies of the *Reynolds* transcript to the examiner or the pretrial briefs or interrogatories. Trial Vol. XII at 1276–80. However, the information about the hydrate theory was furnished to the PTO as it is all contained in the Whidby report. *Id.* at 1277–78.

158. It is undisputed that the *Reynolds* action settled with Reynolds acknowledging that the DIET process did not infringe the G–13 patents in suit and that B & W was informed of this settlement. Plaintiffs' exhibit 30; fact finding 63, *supra*.

159. Since the representations made by plaintiffs during the course of the *Reynolds* action are based upon and contained in a report that was submitted to the PTO, while they are material in the sense that a reasonable examiner would want to know about same, they were disclosed. Fact finding 156, *supra*. Such disclosure is inconsistent with deceptive intent to mislead the PTO; therefore, there was no inequitable conduct on plaintiffs' part.

*The Contract Claims*

160. In addition to the Count I patent infringement claim, plaintiffs have asserted various claims sounding in contract against defendant, specifically: Count II alleging breach of contract, Count III alleging unjust enrichment, and Count IV alleging misappropriation of trade secrets (collectively "the contract claims").

161. The contract claims pivot around B & W's right to use plaintiffs' know-how in connection with the design and construction of its Macon expanded tobacco facility. The know-how or DIET know-how is that body of technical information compiled by plaintiffs relating to the commercial practice of the DIET technology and process. Fact finding 30, *supra*.

162. Upon learning of the DIET process through trade publications and contacts with BOC (then Airco, Inc.) representatives, both B & W and BATCO took steps to study and evaluate the process in an effort to determine "whether what was being claimed seemed to be a likely and worthwhile thing to follow." Trial Vol. VIII at 723; *see also* Vol. VII at 623–24. B & W and BATCO kept each other informed of their contacts and progress with BOC. Trial Vol. VII at 624.

163. BATCO decided to give serious consideration to the DIET process, and as a result, a meeting took place in Murray Hill, New Jersey, in 1977 between representatives of BOC and Mr. Norman Willis and Mr. Ken McLean of BATCO. Trial Vol. VII at 723–24.

164. Before this meeting took place, BATCO signed confidentiality agreements with BOC and Philip Morris at their request and as a pre-condition to "further discussion with Airco and the visit to the Philip Morris plant using the process." Plaintiffs' exhibit 555; Trial Vol. VIII at 724–25.

165. Plaintiffs' know-how, including tours of the Philip Morris DIET plant, is confidential and not a matter of public record. Trial Vol. V at 388. BOC will disclose a certain amount of confidential information for purposes of evaluation to a third party contemplating whether to take a license if that party executes a confidentiality agreement promising to keep the information secret. *Id.* at 388–89.

166. At the Murray Hill meeting, BATCO made its negotiating position clear: BATCO wanted to negotiate a patent license agreement with BOC covering all BATCO associate companies as well as a know-how agreement covering all BATCO associates for a single fee. Trial Vol. VIII at 726–29; plaintiffs' exhibit 557. BATCO made it clear from the outset that B & W was a member of the BAT group of companies. Defendant's exhibit 139 at 2; Trial Vol. VIII at 727–28.

167. A three member team from B & W took the lead in negotiations with BOC at BATCO's request in the fall of 1977. Trial Vol. VII at 624–25; Vol. VIII at 730–33; plaintiffs' exhibit 559; plaintiffs' exhibit 449. The B & W team consisted of Dr. Sanford, Bill Mason, and Dave Strubel. Trial Vol. VII at 629.

168. B & W, like BATCO, was required to sign a confidentiality agreement with both Philip Morris and BOC as a preliminary step to becoming fully involved in the negotiating process. Trial Vol. V at 390–91; Vol. VII at 636; plaintiffs' exhibit 5;

plaintiffs' exhibit 6. *See also* defendant's exhibit 174.

169. The confidentiality agreement with Philip Morris is representative and provides in relevant part:

3. (a) Subject to the provisions of Paragraph 1 hereof, DISCLOSEE shall for a period of ten (10) years from the date of receipt thereof hold in confidence and not disclose any Confidential and Proprietary Information without specific written approval of PHILIP MORRIS, to any third party, including affiliates or subsidiaries of DISCLOSEE, nor itself use any Confidential and Proprietary Information *for any purpose other than to study the technical feasibility of the above-mentioned process for expanding tobacco.* DISCLOSEE agrees that only those members of its staff who need to have access to Confidential and Proprietary Information in order to perform their duties will be authorized to receive the same, and then only to the extent needed.

(b) Nothing in this Agreement shall prevent the DISCLOSEE from discussing the technical feasibility of the above-mentioned process for expanding tobacco with British-American Tobacco Co., Ltd. (hereinafter BAT), or any affiliate or subsidiary of BAT, provided that BAT or the affiliate or subsidiary involved has entered into a written and currently effective confidentiality agreement with PHILIP MORRIS covering the same subject matter.

4. No disclosure of information by PHILIP MORRIS in connection with this Confidentiality Agreement shall be construed as granting, either expressly or by implication, to DISCLOSEE or any other corporation, firm or person, any right or license under such disclosed information, except for the purposes expressly stated in this Confidentiality Agreement.

Plaintiffs' exhibit 6 at 3, ¶¶ 3 and 4 (emphasis added); *cf.* plaintiffs' exhibit 5 at 1.

170. BOC was not in a position to turn over any appreciable amount of know-how

to B & W or BATCO before BATCO paid the $500,000.00 fee up front, because the cross licensing agreement between BOC and Philip Morris prohibited such disclosure to any third party "other than under a grant by AIRCO of a sublicense pursuant to paragraphs 14 and 16 hereof, without the prior approval of PHILIP MORRIS." Defendant's exhibit 159 at 23, ¶ 13; Trial Vol. V at 437–38; Vol. VII at 638.

171. BOC could not provide Philip Morris know-how to a third party pursuant to a confidentiality agreement. Defendant's exhibit 159 at 23, ¶ 13; Trial Vol. V at 438, 442–43.

172. Neither B & W nor BATCO received anything of substance in the way of know-how between the time the confidentiality agreements were signed in 1977 and the execution of the Know-How License Agreement and Patent License Agreement in September, 1978. Trial Vol. VIII at 734–35.

173. BOC drafted the know-how agreement. Defendant's exhibit 139. BATCO informed BOC that a single up-front $500,000.00 fee would be acceptable. Trial Vol. VIII at 731; plaintiffs' exhibit 559. B & W was identified as the first probable user of the know-how for a 400 pound per hour plant. Trial Vol. VIII at 727; plaintiffs' exhibit 559; defendant's exhibit 139 at 2; plaintiffs' exhibit 296; plaintiffs' exhibit 449 at 1.

174. Two separate license agreements— the Know-How License Agreement and the Patent License Agreement—were entered into by BATCO and BOC on or about September 1, 1978. Plaintiffs' exhibits 13 and 14. The Know-How Agreement provides for a one-time know-how fee for the BAT group of companies as envisioned by the parties:

4. Within thirty (30) days after the effective date hereof, BAT shall pay to AIRCO the sum of Five Hundred Thousand Dollars ($500,000.00) in U.S. funds without deduction of any kind. Said payment to represent payment in full for the rights granted to BAT by AIRCO in ac-

cordance with the provisions of this Agreement.

Plaintiffs' exhibit 13 at 4, ¶ 4.

175. BATCO paid BOC a one-time only know-how fee as required by paragraph 4 of the Know-How License Agreement on or about September 27, 1978, within thirty days of execution of the agreement. Plaintiffs' exhibit 313; see also defendant's exhibit 53.

176. The Know-How Agreement is a group license agreement that grants a know-how license to BATCO and gives BATCO the right to grant licenses to its subsidiaries to use the know-how. Plaintiffs' exhibit 13 at 8, 9 ¶¶ 6(a) and 6(b); cf. Trial Vol. VIII at 727–29.

177. Paragraphs 6(b) and 6(c) of the Know-How License Agreement govern and define BATCO's right to license its subsidiaries to use the know-how and provide in relevant part:

(b) Subject to BAT's compliance with the requirements of subparagraph 7(b) hereof, BAT may disclose the KNOW-HOW made known to it hereunder, or any portion thereof, to any of its subsidiaries along with a grant to such subsidiaries of a license to use the same to process smoking material; provided that any such subsidiary must first take a license under any of the PATENT RIGHTS (as that term is defined in a Patent License Agreement of even date herewith between the parties hereto) in the country in which such subsidiary is sublicensed to use the said KNOW–HOW if the PATENT RIGHTS extend to such country.

(c) BAT shall keep AIRCO currently advised as to which of its subsidiaries it desires to extend the right to use the KNOW–HOW disclosed hereunder so that AIRCO may assure itself that each such subsidiary has, where necessary, taken a Patent License in accordance with paragraph 6(b) above prior to any disclosure to it of any of the KNOW–HOW.

Plaintiffs' exhibit 13 at 8, 9, ¶¶ 6(b) and (c).

178. During this period of time, starting with negotiations between BOC and BAT-

CO in 1977 through execution of and payment for the Know-How License Agreement in September, 1978, Brown and Williamson Tobacco Corporation (B & W) was a wholly owned subsidiary of Brown and Williamson Industries, Inc. which was in turn a wholly owned subsidiary of BATUS, Inc. Defendant's exhibit 340C at 1, 2; *see also* fact finding 3, *supra*. At that time BATUS, Inc. was a wholly owned subsidiary of Brown and Williamson Limited which was itself a wholly owned subsidiary of British-American Tobacco Company, Ltd. (BATCO). Defendant's exhibit 340C at 1, 2; *see also* Trial Vol. VIII at 751–53. Therefore, B & W was a subsidiary of BATCO in September, 1978, within the meaning of paragraph 2(a) of the Know-How License Agreement. *See* plaintiffs' exhibit 13 at 2, ¶ 2(a).

179. BATCO requested that BOC transmit the know-how directly to B & W, BAT in England, and another BATCO subsidiary, Imperial of Canada. Trial Vol. VIII at 748–50.

180. The evidence is overwhelming that BOC in fact transferred the know-how directly to B & W over an extended period of time and participated in several meetings with BATCO and B & W personnel at which know-how was transferred. *E.g.*, plaintiffs' exhibit 199; plaintiffs' exhibit 200; defendant's exhibit 242. At least the following transfers occurred:

(a) On September 29, 1978, BOC forwarded part 1 of the know-how "called for in the recent agreement between our companies" directly to B & W. Defendant's exhibit 185.

(b) On December 5, 1978, BOC forwarded part 2 of the know-how "called for in the recent agreement between our companies" directly to B & W. Defendant's exhibit 186.

(c) On February 21, 1979, BOC forwarded know-how additions and revisions received from Philip Morris since part 2 was transferred and promised to send B & W copies of the additional know-how compilations as they became available. Plaintiffs' exhibit 197.

(d) On November 19, 1979, BOC forwarded part 4 of the know-how directly to B & W and noted that "volume 4 ... contains proprietary information, and is, therefore, subject to the know-how license agreement and its clauses." Defendant's exhibit 155.

(e) On January 14, 1980, BOC forwarded additional items of know-how directly to B & W incuding specifications for $CO_2$ compressors and electric motors. Defendant's exhibit 237.

181. The weight of the evidence demonstrates that the know-how passed to B & W pursuant to the know-how agreement, not the confidentiality agreement. *E.g.*, plaintiffs' exhibit 199; plaintiffs' exhibit 200; defendant's exhibit 185; defendant's exhibit 186; defendant's exhibit 155; Trial Vol. V at 442–43; *cf.* Trial Vol. V at 391; Willis deposition at 171.

182. It is undisputed that B & W used the know-how to design, build and operate the Macon expanded tobacco facility and to that end provided its engineering firm, Davey McKee International, with a copy of the know-how subject to a secrecy agreement. Trial Vol. III at 243, 245; Vol. VII at 658–59, 677–78.

183. The evidence is conclusive that plaintiffs knew B & W was using the know-how to build a DIET plant at its Macon facility and actively encouraged and assisted B & W's efforts. For example:

(a) On April 17, 1979, BOC submitted a proposal and bid to B & W for the engineering design of a commercial scale DIET plant. Defendant's exhibit 149. BOC representatives went to B & W's headquarters in Louisville and met with B & W personnel to discuss and review this proposal. Defendant's exhibit 150.

(b) On June 11, 1979, BOC withdrew its bid on the engineering design for B & W's DIET plant but offered its assistance "in interpreting the DIET know-how for the benefit of engineers on the job." Defendant's exhibit 151.

(c) BOC continued to provide B & W with additional assistance, input and recommendations regarding the design and con-

struction of the Macon DIET plant. *E.g.,* defendant's exhibit 152, defendant's exhibit 153, plaintiffs' exhibit 202; plaintiffs' exhibit 212; plaintiffs' exhibit 348.

(d) On February 19, 1980, BOC submitted a bid on B & W's carbon dioxide storage requirements and equipment. Defendant's exhibit 39.

(e) This bid was accepted and BOC sold B & W the carbon dioxide storage equipment for the Macon DIET facility. Trial Vol. V at 419. Additionally, BOC has sold B & W the $CO_2$ used at the Macon plant since late 1982 or early 1983 at a price of approximately $500,000.00 per year. *Id.* at 419–20.

(f) Philip Morris also offered B & W its assistance and even commented on design changes Philip Morris would consider making given the opportunity to redesign its DIET unit. Defendant's exhibit 245; plaintiffs' exhibit 201.

184. Plaintiffs did not object to B & W's use of the know-how until this lawsuit was filed. Trial Vol. VII at 670; Vol. VIII at 766.

185. The critical question on which the contract claims turn is when and whether B & W was licensed to use the know-how, and on this point the evidence is conflicting:

(a) The know-how agreement requires that BATCO keep BOC advised "as to which of its subsidiaries it desires to extend the right to use the KNOW–HOW." Plaintiffs' exhibit 13 at 9, ¶ 6(c); *see* fact finding 177, *supra.* However, the agreement does not require that a know-how sublicense to a BATCO subsidiary be in writing, and no such written sublicense from BATCO to B & W exists. Plaintiffs' exhibit 13; Trial Vol. V at 432–33; Vol. VIII at 739; plaintiffs' exhibit 480.

(b) Mr. Steinberg, manager of BOC's licensing program, testified that BATCO did not formally notify BOC of its intent to license B & W under the know-how as required by paragraph 10 of the know-how agreement. Trial Vol. V at 390; *cf.* plaintiffs' exhibit 13 at 12, ¶ 10.

(c) Mr. Willis of BATCO testified that BOC was informed and advised that B & W

was authorized to use the know-how and that the formal notice requirements of paragraph 10 were met. Trial Vol. VIII at 778–80.

186. B & W's witnesses testified on deposition that the know-how sublicense from BATCO to B & W was the subject of an oral agreement between Dr. Hughes of B & W and Mr. Sheehy, Vice Chairman of BAT Industries, but could not document when this conversation took place. Sanford deposition at 273, 277, 280, 468; Strubel deposition at 151–52; Mason deposition at 35–36; Willis deposition at 96–97. The existence of this oral agreement is shown by the following documentary evidence:

(a) On September 6, 1978, BATCO wrote to the Chief of Exchange Control, Bank of England, advising him of BATCO's desire to enter into a license agreement with BOC and seeking approval for the transfer of $500,000.00 from the United Kingdom to the United States. Defendant's exhibit 53; *see also* Trial Vol. VIII at 741–42. This letter implicitly discloses BATCO's intent to sublicense B & W:

> It is proposed that the outlay of US$500,000 should be recovered by BAT from 12 subsidiary companies which have been identified as potential users of the process. Brown and Williamson Tobacco Corporation will pay US$100,000 immediately and the remainder will pay US$47,000 each on signing sublicenses over the next three years. Subsidiaries, other than those already identified, are expected to acquire a sublicense at a later date and each will pay a similar fee.

Defendant's exhibit 53 at 2.

(b) On November 2, 1979, BATCO wrote to B & W requesting remittance of $100,000.00 as B & W's contribution to the $500,000.00 BATCO paid BOC for the DIET know-how. Defendant's exhibit 230.

(c) B & W remitted $100,000.00 to BATCO by corporate check dated November 16, 1979. Defendant's exhibit 229; Trial Vol. VII at 659–64.

(d) B & W's corporate accounting records concerning estimates on DIET costs and a DIET cost status report show

that $100,000.00 was paid as "BAT fee (know-how)." Plaintiffs' exhibit 268 at 18115, Item D; plaintiffs' exhibit 274 at 14343.

187. Plaintiffs identified B & W as a licensee authorized to practice the DIET process in the United States in pre-trial discovery during the *Reynolds* litigation. Defendant's exhibit 116 at 6; defendant's exhibit 117 at 2; *see also* fact finding 63, *supra.*

188. B & W was licensed under the know-how agreement as of November, 1979. Fact findings 179–187, *supra.*

189. Mr. Willis of BATCO wrote BOC on March 25, 1982, to advise BOC that due to a corporate reorganization, B & W was no longer a direct subsidiary of BATCO but instead a related company. Defendant's exhibit 47; *see also* fact finding 178, *supra.* Mr. Willis sought BOC's assurance that B & W was still a subsidiary within the meaning of the Patent License Agreement in order to insure that the subsidiary royalty rate would still be available. Defendant's exhibit 47; Trial Vol. VIII at 753–58.

190. BOC did not respond to Mr. Willis' letter nor take issue with it. Trial Vol. V at 394–95, 451–53; Vol. VIII at 753–58.

191. The Know-How License Agreement imposed an obligation on each licensed subsidiary to take a patent license under the patent rights "in the country in which such subsidiary is sublicensed to use the said KNOW HOW if the PATENT RIGHTS extend to such country." Plaintiffs' exhibit 13 at 9, ¶ 6(b); *see also* fact finding 177, *supra.*

192. The term "Patent Rights" is defined in relevant part in the Patent License Agreement as follows:

(b) "PATENT RIGHTS" as used herein shall mean

(i) all patents issued throughout the world based upon U.S. Patent Applications Serial No. 439,804, filed February 5, 1974, and Serial No. 441,767, filed February 12, 1974; including all counterparts, divisions, continuations, renewals, reissues and extensions thereof; and

(ii) all patents *now or hereafter owned* by Philip Morris Incorporated (said term as used in this paragraph to include any of its affiliates or subsidiaries licensed under any of the improvement patents of Philip Morris Incorporated and/or AIRCO and set forth in either this or the immediately following subsection), or under which Philip Morris Incorporated has acquired the free right to license others issued throughout the world claiming an invention made prior to September 1, 1982, directed to a process for expanding smoking material which comprises the steps of impregnating the smoking material with liquid carbon dioxide under conditions such that substantially all of the liquid carbon dioxide is maintained in liquid form to impregnate the smoking material with the liquid carbon dioxide, subjecting the liquid carbon dioxide-impregnated smoking material to conditions such that a substantial amount of liquid carbon dioxide is converted to solid carbon dioxide and thereafter subjecting the solid carbon dioxide-containing smoking material to conditions whereby the solid carbon dioxide is vaporized to cause expansion of the smoking material, *any apparatus specifically adapted for use in practicing such process,* or any product obtained by such process; ...

Plaintiffs' exhibit 14 at 2–3, ¶ 1(b)(i) and (ii) (emphasis added).

193. It is undisputed that no patent rights within this definition existed in the United States as of September, 1978, when the Patent License and Know-How License Agreements were executed and where B & W intended to use the DIET know-how. Trial Vol. VII at 716; Vol. VIII at 745, 749, 788.

194. The first DIET patent to issue in the United States within the meaning of patent rights was the Markwood patent on impregnator design, United States Patent Number 4,165,012, issued August 21, 1979 (plaintiffs' exhibit 331). Trial Vol. V at 424–25; Vol. VII at 684–86; *see also* fact finding 148, *supra.*

195. BOC informed BATCO by letter dated May 8, 1980, that the Markwood patent was within the definition of patent rights as required by the patent license agreement. Plaintiffs' exhibit 694; plaintiffs' exhibit 14 at 5, ¶ 4(a); *see also* Trial Vol. V at 393.

196. Mr. Strubel of B & W acknowledged on deposition that the Markwood patent was a DIET improvement patent that the B & W negotiating team wanted BAT to have the freedom to use. Strubel deposition at 144.

197. B & W had some knowledge of the Markwood patent as it was included on the schematic diagram of the MET plant and equipment arrangement. Plaintiffs' exhibit 333; *see* fact finding 148, *supra.* The Markwood patent was also mentioned as a consideration in B & W's advice of counsel letter dated September 21, 1982. Defendant's exhibit 345 at 2.

198. B & W's damages expert testified at trial that the requirement to take a patent license where patent rights existed was part of the consideration for the know-how. Trial Vol. XII at 1229.

199. The intent of the parties is clear: an obligation existed on the part of a subsidiary to take a patent license when a patent within the definition of patent rights issued. *E.g.,* Trial Vol. VII at 668; Vol. VIII at 755–59, 764–65; Willis deposition at 90–91, 175–76, 243; Strubel deposition at 154–55, 180; *see also* fact findings 191–92, *supra.*

200. It is undisputed that B & W has not taken a patent license or paid patent royalties. Trial Vol. II at 131–32; Vol. V at 395, 409; Vol. VII at 668–69, 674–76.

201. Mr. Steinberg began asking Mr. Willis in late 1982 and early 1983 why B & W was not paying patent royalties. Trial Vol. V at 397, 455–56; Vol. VIII at 789–91.

202. Mr. Willis urged Mr. Steinberg not to take precipitate action until the eve of this litigation because "it was basically an internal political problem between BATCO and B & W ... but the problem would be worked out and we would get royalties." Trial Vol. V at 397; Vol. VIII at 790–91.

203. Mr. Steinberg ultimately demanded a meeting with Mr. Willis and other BATCO personnel regarding the royalty problem with B & W, and a meeting was held in March of 1984. Trial Vol. V at 399–400.

204. After this March, 1984, meeting, BATCO advised BOC by letter dated April 24, 1984 "that since the issue is one which relates to Brown and Williamson's activities in its own domestic market it is felt that the proper way to proceed with this matter is for you to discuss it direct with Brown & Williamson in Louisville." Plaintiffs' exhibit 480.

205. Until this letter, BOC had been advised to deal directly with BATCO and not to deal with the subsidiaries. Trial Vol. V at 400.

206. B & W and BOC representatives met in New York in May, 1984, at which time B & W flatly refused to take a patent license and pay royalties on the DIET process patents in suit. Trial Vol. V at 400–01; Vol. VII at 669–70.

207. This lawsuit was filed approximately one week after the May, 1984, meeting. Trial Vol. VII at 670.

208. B & W could have taken a patent license at any time until after the May, 1984, meeting but chose not to do so. Trial Vol. V at 400–02.

*The Antitrust Counterclaim*

209. B & W presented virtually no evidence at trial in support of its antitrust counterclaim other than Mr. Goldsmith's testimony that there is a market for expanded tobacco processes in the United States. Trial Vol. II at 122–23. Mr. Steinberg testified on cross-examination that while he would like to see every tobacco company in the United States using the DIET process, "there was no attempt in the U.S. when I was there to do anything about the U.S. market in any major way." Trial Vol. V at 469.

210. There was no expert testimony at trial on the scope of the relevant market, plaintiffs' share of the market, plaintiffs' willful efforts to monopolize that market, or more importantly, R.J. Reynolds' share

of the market. On the contrary, Mr. Steinberg testified that plaintiffs compete with Reynolds' G–13 process. Trial Vol. V at 468–69.

211. BOC and Philip Morris are mutually cross-licensed under each other's patent rights and know-how. Defendant's exhibit 159; *see* fact finding 23, *supra.* This agreement was modified after Philip Morris ultimately prevailed in the interference proceedings with BOC to include a provision whereby Philip Morris would pay BOC royalties on expanded tobacco it processed for third parties in the United States. Trial Vol. V at 464–66; *cf.* defendant's exhibit 159 at 24, ¶ 15.

212. In fact, no such royalties have ever been paid by Philip Morris to BOC. Trial Vol. V at 387, 465.

213. Despite BOC's patent counsel's opinion that Mr. Michals could still obtain a patent notwithstanding the award of priority to Burde, Examiner Millin rejected Michals' claims as unpatentable over the issues in the interference. *Compare* defendant's exhibit 50 *with* defendant's exhibit 54 at 155–57; *see also* fact finding 25, *supra.*

214. The evidence shows BOC withdrew the Michals patent application because it lost the interference proceeding, not because Philip Morris requested that it do so. Defendant's exhibit 54 at 109–10; Trial Vol. V at 473; *see also* fact finding 25, *supra.*

215. Plaintiffs' cross licensing agreement of itself does not constitute evidence of a specific intent to combine, comspire, and monopolize in restraint of trade. *See* defendant's exhibit 159.

216. B & W's negotiating team for the BATCO–BOC licenses saw nothing illegal or objectionable in these licenses in the antitrust sense. Sanford deposition at 585–86.

217. There is no credible evidence suggesting that plaintiffs' effort to protect its patents and obtain patent royalties by means of this lawsuit was undertaken in bad faith.

*Damages*

218. B & W saves from $10 to $18 million dollars per year by its use of the DIET process. Trial Vol. III at 249; Vol. VII at 696; *see also* fact finding 87, *supra.*

219. B & W's capital expenditure on its liquid $CO_2$ expansion facility amounted to approximately $18.5 million dollars. Trial Vol. III at 249–50; Vol. VII at 699. B & W's own financial analysis calculated that the DIET facility would pay back capital expenditure in 2.6 years. Plaintiffs' exhibit 259, 260.

220. B & W expanded approximately 26 million pounds of tobacco in its Macon facility through July, 1985. Plaintiffs' exhibit 688; fact finding 88, *supra.*

221. The Patent License Agreement provides for a royalty rate of eight cents ($.08) per pound for the first twenty million pounds of smoking material processed and four cents ($.04) for each pound of smoking material in excess of twenty million pounds. Plaintiffs' exhibit 14 at 7–8, ¶ 5(b)(i).

222. The Patent License Agreement provides for a transition point of fifteen million pounds at which point the royalty rate is reduced if two or more members of the BAT group commence operations under a patent license. Plaintiffs' exhibit 14 at 8, ¶ 5(c).

223. Plaintiffs' patent license agreements with American Brands, Inc. and Rothmans International Limited also provide for a royalty rate of eight cents/four cents with a transition point at twenty million pounds, unless two or more subsidiaries process smoking material in a given country, in which event the reduction in royalty rate occurs when the combined amount of smoking material processed reaches twenty million pounds. Plaintiffs' exhibit 652 at 6–7, ¶ 5; plaintiffs' exhibit 653 at 5–6, ¶ 5.

224. The eight cents/four cents rate constitutes an established royalty for the practice of patents in suit. *See* fact findings 221–23, *supra.*

225. The DIET royalty rate for a separate corporation as opposed to a group subsidiary rate is ten cents ($.10) for the first number of pounds and five cents ($.05) thereafter. Trial Vol. V at 402.

226. Reynolds G–13 royalty rate is twelve cents ($.12) for the first fifty million pounds and nine cents ($.09) thereafter. Plaintiffs' exhibit 276 at 2.

227. This is an exceptional case as B & W willfully and deliberately chose to pursue a calculated risk and infringe the patents in suit.

*Conclusions of Law*

I. THE PATENT CLAIMS

■ B & W attacks the validity and enforceability of the patents in suit and raises five principal contentions in support of its position: (1) the patents are invalid due to obviousness; (2) Mr. Chester Michals' work is invalidating prior art under 35 U.S.C. §§ 102(f) and (g) for purposes of the 35 U.S.C. § 103 obviousness determination; (3) the patents in suit are unenforceable because plaintiffs secured them through inequitable conduct; (4) the MET process does not infringe the patented claims because it operates by virtue of gaseous carbon dioxide impregnation—not liquid carbon dioxide impregnation as claimed; (5) the claims added during the reissue proceeding cannot be enforced against B & W

under 35 U.S.C. § 252 and the doctrine of intervening rights. These arguments reduce down to three basic issues common to almost all patent litigation: validity, enforceability and infringement. The court will treat each of these basic issues in turn. Defendant has raised the additional argument by way of counterclaim that plaintiffs have violated the antitrust laws and abused the patent system by endeavoring to enforce invalid patents against it. The court will discuss the antitrust counterclaim separately from the basic patent issues.

A. *Validity*

All patents are presumed valid by Congressional fiat. 35 U.S.C.A. § 282 (West 1984).[5] The ultimate burden of establishing invalidity rests upon the party asserting same by clear and convincing evidence. *E.g., Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 293 (Fed. Cir.1985); *Atlas Powder Co. v. E.I. duPont de Nemours & Co.*, 750 F.2d 1569, 1573 (Fed.Cir.1984); *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1534 (Fed.Cir. 1983); 4 *Deller's Walker on Patents* § 261 at 166 n. 3 (2d ed. 1965) (cases cited therein). Accordingly, B & W bears the heavy burden of overcoming the statutory presumption of validity by clear and convincing evidence.

---

**5.** 35 U.S.C.A. § 282 (West 1984) provides in relevant part:

A patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim. The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity.

The following shall be defenses in any action involving the validity or infringement of a patent and shall be pleaded:

(1) Noninfringement, absence of liability for infringement or unenforceability,

(2) Invalidity of the patent or any claim in suit on any ground specified in part II of this title as a condition for patentability,

(3) Invalidity of the patent or any claim in suit for failure to comply with any requirement of sections 112 or 251 of this title,

(4) Any other fact or act made a defense by this title.

In actions involving the validity or infringement of a patent the party asserting invalidity or noninfringement shall give notice in the pleadings or otherwise in writing to the adverse party at least thirty days before the trial, of the country, number, date, and name of the patentee of any patent, the title, date, and page numbers of any publication to be relied upon as anticipation of the patent in suit or, except in actions in the United States Claims Court, as showing the state of the art, and the name and address of any person who may be relied upon as the prior inventor or as having prior knowledge of or as having previously used or offered for sale the invention of the patent in suit. In the absence of such notice proof of the said matters may not be made at the trial except on such terms as the court requires.

### 1. *Obviousness*

A patent may not be obtained if its subject matter as a whole, viewed in light of the prior art, would have been obvious at the time the invention was made to a person having ordinary skill in the art. 35 U.S.C.A. § 103 (West Supp.1986).[6] The Supreme Court dictated the basic factual determinations relevant to the obviousness inquiry in *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). The obviousness determination under Section 103, the *Graham* court's decision and established precedent require that this court make specific factual findings with respect to the scope and content of the prior art; the differences between the prior art and the claimed subject matter as a whole; the level of ordinary skill in the art; and, where relevant, the objective evidence of nonobviousness or secondary considerations such as commercial success, longfelt need, failure of others, copying, and unexpected results. *E.g.*, *Graham v. John Deere*, 383 U.S. at 17–18, 86 S.Ct. at 693–94; *Ashland Oil v. Delta Resins*, 776 F.2d at 291–92; *Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 454 (Fed.Cir. 1985); *W.L. Gore & Associates, Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1550 (Fed.Cir. 1983), *cert. denied*, 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984); *Stratoflex, Inc. v. Aeroquip*, 713 F.2d at 1535. The Federal Circuit Court of Appeals has observed that, "[t]he obviousness determination is 'a legal conclusion based on factual evidence.'" *Stratoflex v. Aeroquip*, 713 F.2d at 1535 (quoting *Stevenson v. International Trade Commission*, 612 F.2d 546 (C.C.P.A.1979)).

This court has made lengthy, detailed findings of fact on each element of the *Graham* inquiry. *See* fact findings 31–91, *supra*. In considering the scope and content of the prior art and the differences between the prior art and the claimed inventions as a whole, the court found: none of the prior art references considered as a whole teach or suggest (1) the use of liquid carbon dioxide in a tobacco expansion process at pressures sufficient to maintain the $CO_2$ in liquid form, (2) reducing pressure to convert the liquid $CO_2$ impregnant to a solid $CO_2$ impregnant or dry ice, or (3) applying positive heat to frozen tobacco to achieve expansion, *i.e.*, the basic process steps of the patents in suit. Fact findings 57–62, *supra*. However, B & W asserts that the Madures patent, Canadian patent number 971,067 (defendant's exhibit 59), considered in combination with Reynolds' South African patents 70/8291 and 70/8292 (defendant's exhibits 253 and 254) teach the invention of the '013 patent. *See* defendant's post-trial proposed fact finding 108 (filed January 21, 1986); fact findings 35–38, 43 *supra*.

The Federal Circuit Court of Appeals has considered this argument stating, "[w]here the party asserting invalidity must rely upon a combination of prior art references to establish invalidity, that party *bears the burden of showing some teaching or suggestion in these references which supported their use in combination.* It is legal error to place this burden on the patentee." *Ashland Oil v. Delta Resin*, 776 F.2d at 293 (citation omitted) (emphasis added). *See also Polaroid Corp. v. Eastman Kodak Co.*, 789 F.2d 1556, 1570–71 (Fed.Cir.1986).

Notwithstanding the fact that these patents in combination arguably do not teach an expansion process wherein solid $CO_2$ or dry ice vaporization causes expansion,

---

**6.** 35 U.S.C.A. § 103 (West Supp.1986) provides in relevant part:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

Patentability shall not be negatived by the manner in which the invention was made. Subject matter developed by another person, which qualifies as prior art only under subsection (f) or (g) of section 102 of this title, shall not preclude patentability under this section where the subject matter and the claimed invention were, at the time the invention was made, owned by the same person or subject to an obligation of assignment to the same person.

there was very little trial testimony on the South African patents and none at all on the Madures patent or its relevance to one skilled in the art. B & W's own corporate representative testified that neither one of the South African patents speaks in terms of a liquid carbon dioxide expansion agent, or the use of pressures sufficient to maintain $CO_2$ in its liquid state, or formation of a hydrate, or heating tobacco impregnated with solid carbon dioxide. Fact finding 38, *supra.* The Madures patent teaches use of nitrous oxide or sulfur dioxide in either liquid or gaseous form as the impregnating agent without emphasis on high pressures. Fact findings 43 and 58, *supra.* All three of these patents were disclosed to the PTO during prosecution of the applications for the patents in suit, and a copy of the Madures patent was given to the PTO during prosecution of the reissue applications.

"Obviousness, however, cannot be established by combining the teachings of the prior art to produce the claimed invention unless there was some teaching, suggestion or incentive in this prior art which would have made such a combination appropriate." *Ashland Oil v. Delta Resins,* 776 F.2d at 297 (citation omitted). B & W has presented no evidence showing that some element or teaching of either the Madures or South African patents supports their use in combination. As such, B & W

clearly has not carried its burden of producing clear and convincing evidence that some teaching in these patents makes their combination appropriate; therefore, the court declines to hold that such a combination is appropriate to establish invalidity.

### 2. *Michals' Work and the Obviousness Inquiry*

B & W maintains that the work of Mr. Chester Michals is invalidating prior art under 35 U.S.C.A. §§ 102(f) and (g) (West 1984)[7] for purposes of the section 103 obviousness determination. B & W argues that Mr. Michals was the first inventor of the "essence" of the DIET process and would have been granted a U.S. patent "but for plaintiffs' agreement to abandon the Michals application." Defendant's post-trial brief on Count I and on defendant's counterclaims, filed January 21, 1986, at 11 n. 2.

The facts surrounding the events leading up to the interference proceeding between the Michals and Burde patent applications, the interference itself, the decision of the United States District Court for the District of New Jersey, and the subsequent action by the PTO are detailed at fact findings 16–25, *supra.* This court carefully read and considered the decision of the Board of Patent Interferences, the decision of the New Jersey District Court, Dr. Burde's notes and memoranda detailing his

7. 35 U.S.C.A. § 102 (West 1984) provides in relevant part:

A person shall be entitled to a patent unless (a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign county, before the invention thereof by the applicant for patent, or
(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or
(c) he has abandoned the invention, or
(d) the invention was first patented or caused to be patented, or was the subject of an inventor's certificate, by the applicant or his legal representatives or assigns in a foreign country prior to the date of the application for patent in this country on an application for patent or inventor's certificate filed more than twelve

months before the filing of the application in the United States, or
(e) the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent, or on an international application by another who has fulfilled the requirements of paragraphs (1), (2), and (4) of section 371(c) of this title before the invention thereof by the applicant for patent, or
(f) he did not himself invent the subject matter sought to be patented, or
(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it. In determining priority of invention there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other.

early $CO_2$ work, the trial testimony, Mr. Michals' deposition, and the Michals and Burde file wrappers before concluding that Mr. Michals work is not prior art to the '013 patent. Fact findings 52–53, *supra*. The uncontroverted facts as found by the New Jersey District Court demonstrate that Mr. Michals' process did not expand tobacco. Fact findings 21–22, *supra*. The New Jersey court found as a matter of scientific fact that the final process step, the application of positive heat, was absolutely indispensable to achieve expansion. *Id.* Mr. Michals' conception admittedly did not include a positive heat step. Furthermore, the Board of Patent Interferences explicitly stated that, "If we were to require such an application of heat, we would find that Burde *et al.* were the first to conceive and reduce the invention to practice." Fact finding 20, *supra*. Since it has been scientifically established that the application of positive heat is an essential step to the success of the invention in suit, it ineluctably follows that Burde *et al.* were the first to conceive and reduce the invention to practice according to the Board of Patent Interference's own logic.

B & W relies heavily upon the case of *In Re Bass*, 474 F.2d 1276 (C.C.P.A.1973) in support of its proposition that the unpublished work of another pursuant to 35 U.S.C. §§ 102(f) and (g) can constitute invalidating prior art under 35 U.S.C. § 103. Defendant also cites the case of *Dale Electronics, Inc. v. R.C.L. Electronics, Inc.*, 488 F.2d 382 (1st Cir.1973), as authority for the proposition that:

> Since § 102 is the referent for § 103, we draw the conclusion that if the facts that the whole of an invention was known to others or that none of the invention was created by the patent applicant bar entitlement under § 102, the condition of knowledge by others or the borrowing by the applicant of a sufficient body of lore to make the invention obvious bars entitlement under § 103.

*Id.* at 386.

The Federal Circuit Court of Appeals discussed in detail the circumstances prerequisite to finding that the work of another available under § 102(g) constitutes § 103 prior art and implicitly reaffirmed the *Bass* decision in *Kimberly Clark Corp. v. Johnson & Johnson*, 745 F.2d 1437 (Fed.Cir. 1984). The concurring opinion in *Kimberly Clark* construes the majority's holding thusly: "this court has extended the scope of what constitutes the prior invention of another, under § 102(g), *to encompass the prior work of another which has been reduced to practice.*" *Id.* at 1460 (Kashiwa, J., concurring) (emphasis added). Judge Kashiwa goes on to explain:

> My construction of the phrase the invention was made in this country by another, as used in 35 U.S.C. § 102(g), is based on the judicial interpretation of that phrase taken in context with the facts as presented in *Bass/Clemens*, and is that the invention of another under § 102(g), to be available as prior art for a section 103 determination, must have been disclosed in an issued U.S. patent. Since Champaigne's work was prior art based solely upon the disclosure of his U.S. patent, his work comports with my construction of § 102(g), and I therefore can concur with the finding of the Majority Opinion that the work of Champaigne does not obviate the claimed invention of Roeder.

> &ast; &ast; &ast; &ast; &ast; &ast;

> I believe that several factual findings would be required before the prior work of another, which is *not* subsequently disclosed in an issued U.S. patent, is used as prior art under section 103 by virtue of section 102(g). These factual findings would include: (1) *Does the weight of the evidence support a finding that prior work of another is an invention, i.e., has it been conceived and reduced to practice;* (2) does the weight of the evidence support the conclusion that this invention has not been abandoned, suppressed or concealed; (3) does the weight of the evidence support the conclusion that this invention has been disclosed; (4) does the weight of the evidence support a finding of priority of this invention over the claimed invention. These factual findings would in turn raise other is-

sues, such as (1) allocation of the burden of proof, (2) quality of proof adduced, (3) quality of proof required to support a conclusion.

*Id.* at 1460–62 (footnotes omitted) (emphasis added).

Of course Judge Kashiwa's admonitions do not have the weight of a majority holding. However, when read together with the majority opinion, the factual inquiries enumerated by the concurrence provide a framework for resolving the § 103 prior art by virtue of § 102 issue facing this court. The Federal Circuit clearly contemplates both a conception and a reduction to practice as prerequisite to finding that the unpublished work of another qualifies as prior art. The *Kimberly Clark* majority states, "Under § 102(g), proof of a conception alone does not suffice to establish Mobley's work as prior to Roeder's invention ... therefore ... Mobley's work was unavailable as § 103 'prior art' under § 102(g)." *Id.* at 1445. The court explains, "[w]hile evidence of in-house testing may be prima facie evidence of conception, reduction to practice requires that an invention be sufficiently tested to demonstrate *that it will work for its intended purpose.*" *Id.* (emphasis added).

Applying these legal principles to the facts before the court, it is apparent that Mr. Michals' work does not constitute a successful conception and reduction to practice because it did not work for its intended purpose. The weight of the evidence compels finding that Mr. Michals' work was not even an invention because it did not expand tobacco. Furthermore, there is not even a scintilla of evidence in the record before this court to indicate that the New Jersey District Court was in error when it awarded priority of invention to Dr. Burde and Mr. Aument.

" 'When the invention has not quite passed beyond experiment and has not quite attained certainty and has fallen short of demonstrating the capacity of the invention to produce the desired result, the invention itself is still inchoate.' " *Kimberly Clark,* 745 F.2d at 1445 (quoting 1 *Deller's Walker on Patents,* § 46 at 202 (2d ed. 1964)). The weight of the evidence supports a finding that Mr. Michals' work was inchoate and a failed experiment, as the New Jersey District Court concluded. Accordingly, Mr. Michals' work is not available as § 103 prior art by virtue of § 102(g) as a matter of law.

B & W also contends that Mr. Michals' work is invalidating prior art under § 102(f) because Mr. Michals was the true inventor of the "essence" of the invention, and the application of positive heat would have been obvious to one skilled in the art. It is quite true that a number of the prior art references include a heat step to achieve expansion. *See* fact findings 35–52, *supra.* It is also true that most of these references were disclosed to the PTO along with many other expansion methods. *Id.* While the concept of applying heat to achieve expansion is certainly present in many of the prior art references, the specific combination under consideration is not explicitly taught by Michals' work or the patents defendant cites. It is quite a leap from a recognition that applying heat to treated tobacco stems, reconstituted tobacco, or leaf would result in expansion to recognition that applying heat to frozen tobacco leaf would result in expansion. There was no trial testimony to the effect that it would have been obvious to do so to one skilled in the art in 1973. It certainly was not obvious to do so to Mr. Michals whose foreign patents include a heat step. Fact finding 52, *supra.*

Nor has B & W presented clear and convincing evidence that Dr. Burde, *et al.* borrowed the whole of the invention or a sufficient body of lore from Mr. Michals to render the invention obvious. *See Dale Electronics v. R.C.L. Electronics,* 488 F.2d at 386. On the contrary, "In determining obviousness, there is 'no legally recognizable or protected "essential", "gist", or "heart" of the invention' ". *W.L. Gore & Associates v. Garlock,* 721 F.2d at 1548 (quoting *Aro Manufacturing Co. v. Convertible Top Replacement Co.,* 365 U.S. 336, 345, 81 S.Ct. 599, 604, 5 L.Ed.2d 592 (1961)). Thus, Mr. Michals cannot be the true inventor of the "essence" of the inventions, and

his work is consequently not available by virtue of § 102(f) as § 103 prior art.

### 3. *Resolution of the Obviousness Inquiry*

As discussed heretofore, the court is of the opinion that the prior art, whether considered of itself or in combination, does not render the claimed inventions as a whole obvious. However, the *Graham* determinations also include the level of ordinary skill in the art and objective evidence of nonobviousness or secondary considerations. Although no testimony directed toward the level of ordinary skill in the art was presented at trial, the court examined the qualifications of the expert witnesses and skilled workers of both parties in reaching its conclusion that the level of ordinary skill was relatively high. Fact finding 69, *supra.* Certainly a degree in chemistry, physics, engineering or chemical engineering would be highly desirable and helpful, but actual, hands-on experience with tobacco would be vital to the hypothetical person having ordinary skill in the art. Despite all their excellent qualifications, B & W's skilled workers testified that while they had knowledge of the individual elements of the claimed process, they did not put these elements or the prior art together to expand tobacco before learning of the DIET process. *See* fact findings 76–82, *supra.* This militates against an obviousness conclusion.

Federal Circuit precedent is definitive: evidence of secondary considerations must always be considered when present in the obviousness determination. *Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 1538 (Fed.Cir.1983) (citations omitted).

> Indeed, evidence of secondary considerations may often be the most probative and cogent evidence in the record. It may often establish that an invention appearing to have been obvious in light of the prior art was not. It is to be considered as part of all the evidence, not just when the decision-maker remains in doubt after reviewing the art.

*Id.* at 1538–39. Evidence of secondary considerations includes commercial success, long felt need, failure of others, copying, and unexpected results. *Graham v. John Deere,* 383 U.S. at 17–18, 86 S.Ct. at 693–94. Additionally "[r]ecognition and acceptance of the patent by competitors who take licenses under it to avail themselves of the merits of the invention is evidence of nonobviousness." *Stratoflex,* 713 F.2d at 1539.

The DIET patents in suit and their commercial embodiment, the DIET process, are undoubtedly a commercial success which have saved Philip Morris approximately $300 million dollars in tobacco costs from 1979 to 1985. Fact finding 73, *supra.* B & W saves approximately $10 to $18 million a year on tobacco costs through its use of the MET process. Fact findings 87, 218, *supra.* Three major competitors, American Brands, Rothmans International, and British American Tobacco Company—the world's largest tobacco company and B & W's corporate parent until June, 1979—are licensed under the inventions of the patents in suit. Fact finding 70, *supra.* Phillip Morris has received approximately $4.5 million dollars in patent royalties and know-how license fees through licensing the DIET patents and technology to these competitors. Fact finding 71, *supra.* This is compelling evidence of nonobviousness.

Additionally, the DIET process satisfied a need in the industry for a high order tobacco expansion process that did not leave an unnatural residue in the tobacco as evidenced by the licenses to competitors and the fact that B & W discontinued its use of Reynolds' G13–C process as soon as its Macon plant became operational. Fact findings 31–34, 91 *supra.* B & W investigated and experimented with other expansion techniques and methods before ultimately rejecting them in favor of DIET. Fact finding 81, *supra.* The uncontroverted evidence establishes that the improved process of the '014 patent in suit achieved unexpected results by raising the tobacco's input moisture levels while lowering pressure levels without decreasing expansion. Fact findings 12, 84–86, *supra.* Finally, if imitation is the sincerest form of flattery, Dr. Burde and Aument *et al.* should be truly flattered because B & W copied their

invention with some modifications. Fact finding 128, *supra.* The court's personal tour of both the Philip Morris and B & W plants reinforced its conclusion with respect to copying, because first-hand observation established that plaintiffs and defendant followed the same steps in the same order to obtain the same result—expanded tobacco.

Upon full consideration of the evidence regarding secondary considerations, the court is persuaded that it establishes nonobviousness. Reviewing all the evidence and arguments with respect to the obviousness determination, the court is persuaded that defendant has not met its burden of presenting clear and convincing evidence that the claimed inventions as a whole would have been obvious at the time they were made to one of ordinary skill in the art. In conclusion, in light of the entire record and the applicable law, the court is convinced that defendant has not carried its burden of proving that the patents in suit are invalid under 35 U.S.C. § 103.

### B. *Enforceability*

■ B & W contends that the patents in suit are unenforceable because plaintiffs procured them by virtue of inequitable conduct before the PTO. B & W advances four main instances of such conduct: (1) Philip Morris failed to identify Michals' work as prior art; (2) Philip Morris failed to advise the Examiner of the limited nature of Burde's and Aument's contribution to the inventions in suit; (3) Philip Morris failed to disclose the true relevance of the Reynolds' South African patents, the Madures patent, and certain in-house, experimental liquid $CO_2$ work performed by R.J. Reynolds; (4) Philip Morris failed to advise the Examiner of the position it took in the *Reynolds* litigation regarding the manner in which the DIET process operates. *See* defendant's post-trial brief on Count I, filed January 21, 1986, at 26–27.

Federal Circuit precedent has settled the law with respect to the necessary factual findings constituting the proscribed conduct, the burden of proof, and the balancing test a district court must follow in this inquiry:

Conduct before the PTO that may render a patent unenforceable is broader than "common law fraud." *Norton v. Curtiss,* 433 F.2d [779] at 793, 167 USPQ at 543–44 [Fed.Cir.1970]. It includes failure to disclose material information, or submission of false material information with an intent to mislead.

\* \* \* \* \* \*

"Inequitable conduct" requires proof by clear and convincing evidence of a threshold degree of materiality of the nondisclosed or false information. It has been indicated that the threshold can be established by any of four tests: (1) objective "but for"; (2) subjective "but for"; (3) "but it may have been"; and (4) PTO Rule 1.56(a), *i.e.,* whether there is a substantial likelihood that a reasonable examiner would have considered the omitted reference or false information important in deciding whether to allow the application to issue as a patent. *American Hoist [& Derrick Co. v. Sowa & Sons, Inc.,* (Fed.Cir.1984) ], 725 F.2d [1350] at 1362, 220 USPQ at 772–73. The PTO standard is the appropriate starting point because it is the broadest and because it most closely aligns with how one ought to conduct business with the PTO. *American Hoist,* 725 F.2d at 1363, 220 USPQ at 773.

\* \* \* \* \* \*

"Inequitable conduct" also requires proof of a threshold intent. That intent need not be proven with direct evidence. *Hycor [Corp. v. Schlueter Co.,* (Fed.Cir. 1984) ], 740 F.2d [1529] at 1540, 222 USPQ [553] at 561. It may be proven by showing acts the natural consequences of which are presumably intended by the actor. *American Hoist,* 725 F.2d at 1363, 220 USPQ at 773; *Kansas Jack, Inc. v. Kuhn,* 719 F.2d 1144, 1151, 219 USPQ 857, 862 (Fed.Cir.1983). Proof of deliberate scheming is not needed; gross negligence is sufficient. *Hycor,* 740 F.2d at 1540, 222 USPQ at 561. Gross negligence is present when the actor, judged as a reasonable person in his position, should have known of the materiality of

a withheld reference. *Driscoll v. Cebalo,* [ (Fed.Cir.1984) ] 731 F.2d [878] at 885, 221 USPQ [745] at 751; *Kansas Jack, Inc. v. Kuhn,* 719 F.2d at 1152, 219 USPQ at 862. On the other hand, simple negligence, oversight, or an erroneous judgment made in good faith, is insufficient. *Orthopedic Equipment Co. v. All Orthopedic Appliances,* 707 F.2d 1376, 1383, 217 USPQ 1281, 1286 (Fed.Cir. 1983).

Once the thresholds of materiality and intent are established, the court must balance them and determine as a matter of law whether the scales tilt to a conclusion that inequitable conduct occurred. *American Hoist,* 725 F.2d at 1364, 220 USQ at 774. If the court reaches that conclusion, it must hold that the patent claims at issue are unenforceable.

*J.P. Stevens & Co. v. Lex Tex Ltd.,* 747 F.2d 1553, 1559–60 (Fed.Cir.1984), *cert. denied,* — U.S. ——, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985); *accord Atlas Powder Co. v. E.I. Du Pont de Nemours,* 750 F.2d 1569, 1577–78 (Fed.Cir.1984).

B & W thus bears the burden of proving by clear and convincing evidence both the threshold degree of materiality and intent constituting inequitable conduct before the PTO. The court will measure each of B & W's allegations of inequitable conduct against the standard enunciated by the Federal Circuit, and then employ the balancing test if the thresholds of materiality and intent are established.

### 1. *Michals' Work and the Nature of Burde's and Aument's Contribution*

B & W's first two allegations of inequitable conduct involve its repeated assertions that Mr. Michals' work is invalidating prior art and that Philip Morris somehow misled the PTO as to the limited nature of Dr. Burde's and Mr. Aument's contribution to the inventions in suit. The court has fully analyzed the argument that Mr. Michals' work is prior art and held against defendant on this point in its discussion of the obviousness inquiry, *supra,* which it will not repeat. The argument regarding the alleged limited contribution of Burde

and Aument appears to be the flip side of this same coin. Mr. Michals' work is not prior art but an inchoate experiment in the view of both the New Jersey District Court and this court. Fact findings 22, 53, *supra.* As such, B & W has failed to sustain its burden of proving by clear and convincing evidence, sufficient facts from which either materiality or fraudulent intent could be inferred from Philip Morris' representations to the PTO regarding Michals' work and the outcome of the interference action.

Additionally, B & W argues that Michals' work is prior art not previously considered by the PTO. Defendant's post-trial brief on Count I, filed January 21, 1986, at 12. Defendant places great weight on the fact that BOC provided the Examiner with a copy of the opinion of the New Jersey District Court awarding priority of invention to Philip Morris while Philip Morris only submitted a copy of the judgment to the PTO. *Id.* at 18–20. However, the same Examiner, Vincent Millin, handled both the Michals and Burde patent applications. Fact finding 17, *supra; see also* fact finding 18–25, *supra.* B & W did not depose Examiner Millin or call him as a witness at trial. Thus, there is absolutely no evidence of record showing that Examiner Millin did not fully consider the opinion of the New Jersey District Court as he was obligated to do, regardless of which party to the interference proceeding submitted it to the PTO:

It suffices, we think, to note the fact that the name of the examiner printed on the Champaigne patent is Charles F. Rosenbaum, the same as that appearing on the Roeder patent. The same K–C patent agent was prosecuting both applications and necessarily knew that *Mr. Rosenbaum was in charge of both of them and had the duty of knowing their contents so as to be sure they claimed distinct inventions.*

*Kimberly Clark v. Johnson & Johnson,* 745 F.2d at 1457 (emphasis added).

Defendant's allegations of fraud on these grounds deal with a hypothetical situation,

not with reality. This court declines to engage in sheer speculation regarding Examiner Millin's state of mind beyond noting that such speculation hardly amounts to clear and convincing evidence of inequitable conduct as a matter of law. B & W has failed to sustain its heavy burden with respect to Michals' work as prior art and Philip Morris' alleged failure to advise Examiner Millin of the facts of the interference proceeding and the relative contributions of Michals, Burde, and Aument. *See* fact finding 25, *supra.*

### 2. The True Relevance of Certain Patents and Reynolds' Experimental Work

Defendant's third instance of inequitable conduct concerns Philip Morris' alleged failure to disclose the true scope and relevance of the Reynolds South African patents, the Madures patent, and certain in-house, experimental liquid $CO_2$ work performed by R.J. Reynolds. Both the Madures patent and the South African patents have been addressed in some detail in the court's analysis of prior art pursuant to the section 103 obviousness inquiry, *supra.* All three of these patents were disclosed to the PTO. Fact findings 35–38, 43, *supra.* Indeed, the PTO was provided with a copy of the Madures patent during prosecution of the reissue patents in suit. Fact finding 43, *supra.* It is hard to imagine an action more inconsistent with an intent to mislead the PTO with respect to the true relevance of a prior art reference than providing a copy of it to the examiner. *Cf. Vandenberg v. Dairy Equipment Co.,* 740 F.2d 1560, 1568–69 (Fed.Cir.1984) (concluding that a holding of fraud cannot be based on a suspicion of misrepresentation where a material reference was described in the patent application but not disclosed as appellant's own device).

Assuming *arguendo* that Philip Morris in fact misrepresented the significance of the teachings of the South African patents, it is undisputed that they were disclosed in the background of the invention section of the patents in suit. Fact findings 36–37, *supra.* "This disclosure is inconsistent with intent to perpetrate fraud on the PTO." *Vandenberg v. Dairy Equipment Co.,* 740 F.2d at 1568. Disclosure of the South African patents and the Madures patent to the PTO precludes a finding of deceptive intent on plaintiffs' part. Consequently, defendant has failed to show by clear and convincing evidence sufficient facts from which inequitable conduct could be inferred based on Philip Morris' representations to the PTO concerning these patents.

B & W also takes issue with Philip Morris' characterization of certain in-house, experimental liquid $CO_2$ work performed by R.J. Reynolds as abandoned, suppressed and concealed. Defendant's post-trial brief on Count I, filed January 21, 1986, at 26. As the court found, this experimental work is material in the sense that it is substantially likely a reasonable examiner would want to know Reynolds' scientists expanded tobacco with liquid $CO_2$ in 1971–1972. Fact findings 64–68, *supra.* However, this work was abandoned as evidenced by Reynolds' own internal feasibility studies which concluded that a liquid $CO_2$ process was not commercially feasible when compared to their G–13 process due to the high pressures involved and the substantial research and development necessary to develop a working process. Fact finding 66, *supra.* This work was also suppressed and concealed since it was never publicized outside the company in trade journals or otherwise, and was never the subject of any patent applications or issued patents. Fact finding 67, *supra.*

Philip Morris informed the PTO that the relevant documents detailing this work were still subject to a protective order in the Virginia District Court and offered to attempt to procure them should the examiner wish to see them. Fact finding 68, *supra.* Such an offer to obtain the relevant reports is inconsistent with deceptive intent to mislead the PTO. *Vandenberg v. Dairy Equipment,* 740 F.2d 1568–69.

Alternatively, considerations of public policy—the "encouragement of public disclosure of new inventions"—counsel in favor of finding that Reynolds liquid $CO_2$

work was abandoned, suppressed and concealed within the meaning of 35 U.S.C. § 102(g). *Del Mar Engineering Laboratories v. United States*, 207 Ct.Cl. 815, 524 F.2d 1178, 1184 (1975). The *Del Mar* court noted:

> As it has been stated, in an interference context, the prior inventor who deliberately suppresses or conceals the knowledge of his invention ... subordinates his claim, in accordance with the general policy of the law in the promotion of the public interest, to that of another and *bona fide* inventor who during the period of inaction and concealment shall have given the benefit of the discovery to the public. Viewed in the light of "the true policy and ends of the patent laws," the latter is the first to invent, and therefor entitled to the reward.... [*Thomson v. Weston*, 19 App.D.C. 373, 381 (1902). *Also, see, Kendall v. Winsor*, 62 U.S. (21 How.) 322, 16 L.Ed. 165 (1858); *Mason v. Hepburn*, 13 App.D.C. 86 (1898); *Young v. Dworkin*, 489 F.2d 1277 (C.C.P.A.1974) *supra.*]

*Id.* at 1184 (footnote omitted). *See also Kimberly Clark v. Johnson & Johnson*, 745 F.2d at 1444 n. 1 (stating that timely filing of patent application and subsequent issuance of patent constitutes sufficient proof that invention was not abandoned, suppressed and concealed).

This court is of the opinion that to charge a corporation like Philip Morris with knowledge of a major competitor's in-house, unpublished, experimental work is contrary to both the public policy behind the patent laws and established business practice. Therefore, the court declines to do so; the *Reynolds* liquid $CO_2$ work was abandoned, suppressed and concealed. Fact findings 63–68, *supra*. B & W has not produced clear and convincing evidence from which fraudulent intent could be inferred due to Philip Morris' characterization of the Reynolds' work as abandoned and never publicized. On the contrary, it appears that B & W has attempted to mislead this court by linking the experimental work together with Reynolds' South African patents.

B & W states in its post-trial brief on the patent claims:

> Philip Morris further breached its duty of candor during the reissue proceedings by ... (b) dismissing certain $CO_2$ experimental work done by Reynolds as "abandoned and *never publicized*" (PX–697 at 59) (emphasis added), despite the fact that the Reynolds South African patents (DX–253; DX–254) known to Philip Morris, which clearly related to work using gaseous and solid $CO_2$ and liquid $CO_2$–water compounds, had obviously been published. The implication of Philip Morris' comments with respect to this work was misleading, and served again to distract the Examiner from fully appreciating the relevance of Reynolds' work.

Defendant's post-trial brief on Count I, filed January 21, 1986, at 26 (footnote omitted).

In fact, the South African patent applications were filed on December 8, 1970, before Mr. Rice, the Reynolds' scientist who experimented with liquid $CO_2$, began his work in early 1971. Fact findings 36–37, 66–67, *supra*. Mr. Frederickson, inventor on the South African patents, testified that while he knew Mr. Rice was working with $CO_2$ he didn't know what Mr. Rice was doing with $CO_2$ or anything about it until the work was completed. Fact finding 67, *supra*. The South African patents were published on August 25, 1971; however, they teach totally different methods of expanding tobacco from the Rice experimental work with liquid $CO_2$. *Cf.* fact findings 36–38 and 63–68. The facts of record indicate these two projects bear no relationship to each other; one project resulted in validly issued patents while the Rice liquid $CO_2$ work was never publicized outside the company until plaintiffs learned of it during discovery in the *Reynolds* litigation. *See id.* Defendant's attempt to link these two unrelated bodies of work together while arguing breach of the duty of candor on plaintiffs' part is arguably a breach of its own duty of candor to this court.

### 3. *Philip Morris' Position in the Reynolds Litigation*

Defendant's final allegation of inequitable conduct on the part of Philip Morris concerns the position taken by Philip Morris in the *Reynolds* litigation where plaintiffs were defending against a charge of infringement. Fact finding 63, *supra*. In the *Reynolds* litigation (Civil Action C–81–1111R, E.D.Va.), plaintiffs' DIET patents and process were accused of infringing Reynolds' G–13 patented process. *Id.* It is undisputed that the *Reynolds* action settled with Reynolds admitting that the DIET patents and process did not infringe the G–13 patents in suit. Fact findings 63, 158, *supra*. Plaintiffs disclosed the fact of the *Reynolds* litigation and its settlement to the PTO during prosecution of the applications for the reissue patents in suit. Fact findings 65, 157–58, *supra*.

B & W argues that plaintiffs breached their duty of candor to the PTO by failing to advise the PTO that in the *Reynolds* action, plaintiffs advanced and emphasized the theory of expansion found in the Whidby Report. *E.g.*, fact findings 110, 153–59, *supra*. As this court understands the sequence of events, Philip Morris undertook additional research into the nature of the DIET process after Reynolds filed suit. Among the results was the Whidby Report which concluded that carbon dioxide reacts with the inorganic free water present in tobacco to form a stable $CO_2$ water compound or hydrate which decomposes upon heating and releases $CO_2$ gas causing expansion. Fact findings 110, 153, *supra*. Plaintiffs provided the PTO with a copy of the Whidby Report during prosecution of the reissue patents in suit. Fact finding 156, *supra*.

B & W points to remarks made by counsel during opening argument in the *Reynolds* action, the testimony of Thomas Mullen, and certain discovery documents—all of which emphasize the hydrate theory of expansion. B & W argues that plaintiffs should be judicially estopped from taking an inconsistent position before this court, *i.e.*, that both solid $CO_2$ or dry ice and a $CO_2$ water compound vaporize or decompose to cause expansion in the DIET process. Defendant cites no cases supporting the proposition that the oral or written argument of counsel in a case that settled without a full adjudication on the merits should be accorded evidentiary weight in a later case involving different parties. *See generally* 22 C. Wright & K. Graham, *Federal Practice and Procedure* § 5163 at 29 (1978) ("It is also well-understood today that the arguments of counsel are not evidence.") Therefore, the court focused on the sworn testimony of Thomas Mullen, a Philip Morris engineer called as an adverse witness and apparently the only Philip Morris witness to testify before settlement.

Mr. Mullen did emphasize the Whidby or hydrate theory of expansion, and this court so found. Fact finding 154, *supra*. However, when pressed by Reynolds' attorney, Mr. Mullen ultimately stated that expansion may be caused partially by the sublimation or vaporization of solid $CO_2$ and partially by the presence of a $CO_2$ water compound that decomposes to generate $CO_2$ gas. *Id.* Mr. Mullen also testified that he was sure liquid $CO_2$ entered the tobacco cells. *Id.* This is not substantially different from what plaintiffs' witnesses stated in this case, *i.e.*, that the DIET process operates with both solid $CO_2$ and a $CO_2$ water compound forming in the tobacco cells. Fact finding 155, *supra*. Both of these theories of operation have been disclosed to the PTO since the PTO was given a copy of the Whidby Report during the reissue proceeding. Fact finding 156, *supra*.

The court will leave aside defendant's argument with respect to the effect of an erroneous statement of physical or chemical phenomena on a patent's validity until its discussion of the infringement issue, *infra*. However, defendant also urges the court to apply the doctrine of judicial estoppel to the instant case because Philip Morris allegedly failed to fully inform the PTO of the position it took in the *Reynolds* action. The doctrine of judicial estoppel or preclusion against inconsistent positions has been defined as "a doctrine of rather vague outline" which "is limited to change of position taken in judicial proceedings,

but it is not based upon finality of judgment." 1B J. Moore, *Moore's Federal Practice* ¶ 0.405[8] at 239 (1984). The doctrine is invoked by the courts against those parties that appear to be "play[ing] 'fast and loose' with the judicial process." *Id.* at 240.

The Federal Circuit has construed this doctrine in *Jackson Jordan, Inc. v. Plasser American Corp.*, 747 F.2d 1567 (Fed.Cir. 1984) stating:

> In all precedent cited to us and which we have researched independently, the party against whom estoppel is invoked received some benefit from the previously taken position, i.e., he "won" because of it and he seeks to "win again" from his original adversary (or one in privity with that person or involved in the same transaction) on a basis which contradicts the prior position.
>
> No case is cited where the doctrine was applied in favor of a total stranger to the first phase of the dispute, such as Jackson Jordan, or indeed, outside the context of a particular set of related transactional facts.

*Id.* at 1579. The *Jackson* court concluded, "In any event, we see no justification for wholly dispensing with reliance and prejudice as minimum requirements under the doctrine of preclusion of inconsistent positions." *Id.* at 1580. This court agrees that reliance and prejudice are necessary elements of the doctrine.

There is no doubt that B & W was and is a total stranger to the *Reynolds* litigation that could not and can not have possibly relied to its detriment on the allegedly inconsistent position advanced by Philip Morris in that action. Nor was the position taken by Philip Morris in the *Reynolds* case a complete about-face from the position it advances before this court. Accordingly, the doctrine of judicial estoppel is not applicable in the case at bar. *Id.*

In short, B & W has not presented clear and convincing evidence from which the court could infer that Philip Morris intended to mislead the PTO regarding its position in the *Reynolds* action. The theory of operation Philip Morris stressed in the

*Reynolds* litigation is contained in the Whidby Report which was disclosed. Since the scientific data from which the hydrate theory derives was disclosed during prosecution of the reissue patents in suit, there is no evidence before the court to support a finding of deceptive intent. The Federal Circuit has repeatedly cautioned that the party asserting fraud carries a heavy burden of proof stating:

> Establishing that a patent was procured by fraud or with such egregious conduct as to render it unenforceable requires clear, unequivocal, and convincing evidence of an intentional misrepresentation or withholding of a material fact from the PTO.... Although inequitable conduct requires less stringent proofs as to both materiality and intent than common law fraud, mere evidence of simple negligence, oversight, or an erroneous judgment made in good faith not to disclose prior art is not sufficient to render a patent unenforceable.... *We do not think it necessarily reflects bad faith for the same counsel to take inconsistent positions in different litigation.* OEC counsel have in this litigation been consistent that the material not disclosed is not relevant. A comparison of OEC counsel's positions in the two cases detracts considerably from their dignity, from which fact appellee has largely benefited. Charging fraud is another matter.

*Orthopedic Equipment Co. v. All Orthopedic Appliances*, 707 F.2d 1376, 1383–84 (Fed.Cir.1983) (citations omitted) (emphasis added); *see also Kansas Jack, Inc. v. Kuhn*, 719 F.2d 1144, 1151 (Fed.Cir.1983).

B & W has cited no authority imposing a duty on Philip Morris to provide the PTO with pre-trial briefs, discovery, arguments of counsel, and the trial transcript of a case that settled with an admission of non-infringement at the risk of a finding of inequitable conduct. *Ergo,* the court will not impose such a duty on Philip Morris or find a breach of the duty of candor to the PTO for its failure to do so.

In summary, B & W has not carried its burden of proving by clear, unequivocal,

and convincing evidence sufficient facts from which this court could infer inequitable conduct as defined by Federal Circuit precedent. On the basis of the record and the applicable law, the court is persuaded that plaintiffs have not committed the kind of fraud on the PTO that would render the patents in suit unenforceable.[8]

### C. *Infringement*

■ Congress has provided that one who without authority violates the exclusive grant conferred by a validly issued patent, 35 U.S.C.A. § 154 (West 1984),[9] by making, using, or selling a patented invention within the United States shall be liable for infringement. 35 U.S.C.A. § 271(a).[10] In *Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 452 (Fed.Cir.1985), the Federal Circuit stated that:

> A determination of patent infringement under 35 U.S.C. § 271(a) involves a two-step analysis of each asserted claim: first, the language of the claim must be interpreted; and second, it must be determined whether the claim "reads on" the accused product or process, that is, whether the claimed invention is being made, used, or sold by the alleged infringer. The first is a question of law for the court, the second an issue of fact.

*Id.* (citation omitted).

The infringement determination also "requires that the asserted claims be compared with the products or processes accused of infringement." *Amstar Corp. v.*

*Envirotech Corp.*, 730 F.2d 1476, 1481 (Fed.Cir.), *cert. denied*, 469 U.S. ——, 105 S.Ct. 306, 83 L.Ed.2d 240 (1984). The patent infringement inquiry focuses on claim interpretation because the claims of a patent define and measure the invention. *E.g., Aro Manufacturing Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 339, 81 S.Ct. 599, 600–01, 5 L.Ed.2d 592 (1961); *Ashland Oil v. Delta Resins*, 776 F.2d at 293; 4 *Deller's Walker on Patents* § 241 at 110–11 (2d ed. 1965) (cases cited therein). "However, 'the claims of a patent must always be explained and read in connection with the specification.'" *Deller's Walker on Patents, supra*, at 111 n. 8 (quoting *Carnegie Steel Co. v. Cambria Iron Co.*, 185 U.S. 403, 432, 22 S.Ct. 698, 709–10, 46 L.Ed. 968 (1902)). In contrast to the obviousness and inequitable conduct inquiries, the burden of proving infringement is upon the patent owner who must show infringement by a preponderance of the evidence. *E.g., Bene v. Jeantet*, 129 U.S. 683, 688, 9 S.Ct. 428, 430, 32 L.Ed. 803 (1889); *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 758 (Fed.Cir.1984); P. Blaustein, *Learned Hand on Patents* §§ 16.1, 16.2 at 179–80 (1983). Thus, the court must first interpret the claims of the patents in suit and then compare them with B & W's MET process to determine whether plaintiffs have met their burden of proof.

The patents in suit are process patents directed toward a process for expanding tobacco using liquid carbon dioxide as the

---

**8.** While the court did not find this as fact, plaintiff's counsel asserted at final argument that plaintiffs invited B & W to come before the PTO during the reissue proceedings of the patents in suit and "have their say in the Patent Office before the experts about whether or not these patents ought properly to issue," but B & W chose not to participate. Oral Arguments of Counsel, March 20, 1986, at 14. It strikes the court as somewhat curious that B & W declined to raise the conduct it alleges as inequitable before the administrative body most directly involved and most uniquely qualified to evaluate same.

**9.** 35 U.S.C.A. § 154 (West 1984) provides in relevant part:

Every patent shall contain a short title of the invention and a grant to the patentee, his heirs or assigns, for the term of seventeen years, subject to the payment of fees as provided for in this title, of the right to exclude others from making, using, or selling the invention throughout the United States, referring to the specification for the particulars thereof. A copy of the specification and drawings shall be annexed to the patent and be a part thereof.

**10.** 35 U.S.C.A. § 271(a) (West 1984) provides in relevant part:

(a) Except as otherwise provided in this title, whoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent.

expansion agent; the claims disclose the processes, methods and apparatus required to practice the inventions in suit. Fact findings 7, 10, *supra*. A process is patentable although the physical phenomena or laws of nature on which it is based are not. *Diamond v. Diehr*, 450 U.S. 175, 183–85, 101 S.Ct. 1048, 1055–56, 67 L.Ed.2d 155 (1981).

Claim 16 of the '013 patent in suit is a broad, representative claim which teaches the three basic steps of the DIET process: (1) impregnating tobacco with liquid carbon dioxide under such conditions that the $CO_2$ is maintained in its liquid form; (2) establishing conditions whereby the liquid $CO_2$ is converted to solid $CO_2$ or dry ice; and (3) subjecting the tobacco containing solid $CO_2$ to conditions whereby the solid $CO_2$ is vaporized to cause expansion. Fact finding 98, *supra*. Claim 1 of the '013 patent is substantially similar to claim 16 except that the first step in claim 1 establishes a temperature limitation for the tobacco, no lower than about $-2°$ C, and speaks of contacting tobacco with liquid $CO_2$ rather than impregnating. Fact finding 8, *supra*. Claims 5 and 17 are substantially similar apparatus claims except that claim 17 establishes a pressure range limitation, between 230 and 915 p.s.i.a., to maintain $CO_2$ in liquid form. *Cf.* fact finding 97 and 99, *supra.*

B & W characterizes the three process steps as follows: "(1) the impregnation of tobacco with liquid carbon dioxide, (2) the conversion of that liquid $CO_2$ to solid $CO_2$ (dry ice) within the tobacco, and (3) the vaporization of that solid $CO_2$ to cause expansion." Defendant's post-trial brief on Count I, filed January 21, 1986, at 28. These three somewhat oversimplified steps must be compared to the steps B & W follows in its MET process to determine the infringement issue, and herein lies the pivotal dispute of this lawsuit.

B & W vigorously argues that its MET tobacco is not impregnated with liquid $CO_2$ but rather with gaseous $CO_2$, consequently no solid $CO_2$ forms within the MET tobacco. Instead, a $CO_2$ water compound forms which decomposes upon heating to release $CO_2$ gas and cause expansion. *E.g., id.* at 29; fact findings 101–02, 109–10, *supra*. B & W further asserts the patents in suit contain erroneous statements of physical or chemical phenomena and are therefore invalid under 35 U.S.C.A. § 101 (West 1984)[11] as lacking utility and 35 U.S.C.A. § 112 (West 1984)[12] as failing to provide a

---

11. 35 U.S.C.A. § 101 (West 1984) provides in relevant part:

Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.

12. 35 U.S.C.A. § 112 (West 1984) provides in relevant part:

The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

A claim may be written in independent or, if the nature of the case admits, in dependent or multiple dependent form.

Subject to the following paragraph, a claim in dependent form shall contain a reference to a claim previously set forth and then specify a further limitation of the subject matter claimed. A claim in dependent form shall be construed to incorporate by reference all the limitations of the claim to which it refers.

A claim in multiple dependent form shall contain a reference, in the alternative only, to more than one claim previously set forth and then specify a further limitation of the subject matter claimed. A multiple dependent claim shall not serve as a basis for any other multiple dependent claim. A multiple dependent claim shall be construed to incorporate by reference all the limitations of the particular claim in relation to which it is being considered.

An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

sufficient disclosure to enable others to practice the invention. *See Raytheon v. Roper*, 724 F.2d 951, 956 (Fed.Cir.1983), *cert. denied*, 469 U.S. 835, 105 S.Ct. 127, 83 L.Ed.2d 69 (1984). Defendant's non-infringement argument hinges on its theory of how the MET process operates, *i.e.*, by means of gaseous $CO_2$ impregnation and formation of a $CO_2$ water compound within the tobacco instead of liquid $CO_2$ impregnation and formation of solid $CO_2$. Fact findings 101–02, 109, *supra*. However, by raising the theory of operation as a defense against infringement, B & W necessarily raises the issues of utility and enablement under sections 101 and 112 which require that B & W produce clear and convincing evidence of invalidity. *Atlas Powder v. E.I. du Pont de Nemours*, 750 F.2d at 1577.

That the claim interpretation required by an infringement analysis will on the proper set of facts involve a determination of enablement and utility is borne out by Federal Circuit precedent. *E.g., Standard Oil v. American Cyanamid*, 774 F.2d at 452–53; *Raytheon v. Roper*, 724 F.2d at 959. The *Raytheon* court clearly acknowledged that there is a relationship between infringement and validity or utility as follows:

4. Lack of utility cannot co-exist with infringement and commercial success.

The wisdom of the trial court in deciding validity and infringement, and the interrelationship of those issues, are manifested in the present case

\* \* \* \* \* \*

A correct finding of infringement of otherwise valid claims mandates as a matter of law a finding of utility under § 101. *The rule is not related, as Raytheon argues, to whether a defendant may simultaneously assert non-utility and non-infringement; a defendant may do so. The rule relates to the time of decision not to the time of trial, and is but a common sense approach to the law. If a party has made, sold, or used a properly claimed device, and has thus infringed, proof of that device's utility is thereby established. People rarely, if ever, appropriate useless inventions.*

Proof of such utility is further supported when, as here, the inventions set forth in claims 2–7 have on their merits been met with commercial success.

*Raytheon v. Roper*, 724 F.2d at 959 (citations omitted) (emphasis added).

The *Raytheon* court also explained the invalidity due to lack of utility and/or enablement argument as follows:

In *Linde Air Products Co. v. Graver Tank & Mfg. Co.*, 86 F.Supp. 191, 197, 75 USPQ 231, 235 (N.D.Ind.1947), *rev'd*, 167 F.2d 531, 536–37, 77 USPQ 207, 212 (7th Cir.1948), *aff'd, Graver Mfg. Co. v. Linde Co.*, 336 U.S. 271, 277–79, 69 S.Ct. 535, 538–39, 93 L.Ed. 672 (1949), certain process claims were held invalid because they included incorrect ideas and;

To make a claim for a ... process in which these erroneous ideas are incorporated is to stake out a process ... which does not in point of fact exist within the invention. While a patent covering a meritorious invention should not be struck down because the patentee has misconceived the scientific principle of his invention, the error cannot be overlooked when the misconception is embodied in the claim.

*Accord, Noma Lites Canada Ltd. v. Westinghouse Electric Corp.*, 399 F.Supp. 243, 253, 186 USPQ 485, 493 (D.D.C.1975) ("When an incorrect or questionable theory of operation is included in a patent claim, that claim is invalid. 35 U.S.C. § 112.") Because it is for the invention as claimed that enablement must exist, and because the impossible cannot be enabled, a claim containing a limitation impossible to meet may be held invalid under § 112. Moreover, when a claim requires a means for accomplishing an unattainable result, the claimed invention must be considered inoperative as claimed and the claim must be held invalid under either § 101 or § 112 of 35 U.S.C.

*Id.* at 956 (citations omitted).

There is a long line of precedent holding that an inventor need not understand the principle of his invention so long as it

works. 4 *Deller's Walker on Patents,* § 238 (2d ed. 1965) (cases cited therein). The Federal Circuit has stated:

> It is undisputed that inclusion of Fromson's theory and belief was unnecessary to meet the enablement requirement of 35 U.S.C. § 112 (that a patentee describe how to make and use the invention). Moreover, it is axiomatic that an inventor need not comprehend the scientific principles on which the practical effectiveness of his invention rests. *See, e.g., Diamond Rubber Co. v. Consolidated Rubber Co.,* 220 U.S. 428, 435–36, 31 S.Ct. 444, 447–48, 55 L.Ed. 527 (1911).

*Fromson v. Advance Offset Plate, Inc.,* 720 F.2d 1565, 1571 (Fed.Cir.1983), *on appeal after remand,* 755 F.2d 1549 (1985) (concluding that there was no basis for incorporating theory of operation as limitation in claim). Still another court stated, "[t]here seems to be some evidence that the Kearns hypothesis is incorrect. However, it doesn't matter in considering the present problem. How the process works is of importance. Whether the inventor knows the theory is unimportant." *Swift Agricultural Chemicals v. Farmland Industries,* 674 F.2d 1351, 15358 (10th Cir.), *cert. denied,* 459 U.S. 860, 103 S.Ct. 132, 74 L.Ed.2d 113 (1982).

This court must interpret the patented claims in light of the applicable law on the enablement and utility issues in order to make an infringement determination. The court must also determine whether plaintiffs have shown infringement by a preponderance of the evidence. A review of the record will further and assist this inquiry.

The PTO concluded during the reissue proceeding that the critical limitation of the claimed inventions was impregnation with liquid $CO_2$. Fact finding 129, *supra.* Plaintiffs presented credible evidence of experiments that demonstrated liquid $CO_2$ impregnation occurs in the claimed process. Fact findings 130–31, 137–40, *supra.* Even more persuasive, however, defendant's expert witness testified that he had no evidence that liquid $CO_2$ did not enter the tobacco cells or that solid $CO_2$ did not form inside the cells. Fact findings 133–36, *supra.* The patent application filed by B &

W's own employees claiming the improved MET process speaks in the same terms as the patents in suit—in terms of a liquid $CO_2$ impregnation process. Fact finding 147, *supra.* Finally, plaintiffs' witnesses quite candidly testified that both gaseous and liquid $CO_2$ impregnation occur in the claimed process forming both solid $CO_2$ and a $CO_2$ water compound inside the tobacco cells. Fact finding 111, *supra.* This court agrees with the PTO that liquid $CO_2$ impregnation is critical to the claimed inventions and concludes on the basis of the evidence before it that liquid $CO_2$ impregnates the tobacco as specified in the patented claims.

Furthermore, it would certainly be an anomalous result for the court to find an insufficient disclosure to enable one skilled in the art to practice the invention when the undisputed evidence showed that one following the steps of the '013 patent and/or the know-how would get expanded tobacco. Fact findings 83 and 112, *supra.* The evidence also revealed that one of B & W's employees was able to expand tobacco with liquid $CO_2$ in early 1978 based on B & W's knowledge at that time which included copies of the British and German counterparts to the patents in suit. Fact finding 77, *supra.* The conclusion is inescapable—B & W was able to practice the inventions of the patents in suit without regard to any theory of operation. Fact finding 77, 114, *supra.*

The evidence also showed that B & W's current tobacco expansion process will not work without the liquid $CO_2$ step. Fact finding 113, *supra.* Further, the evidence showed that B & W used and followed plaintiffs' know-how package, with some design improvements and variations, to design, build and operate its Macon expanded tobacco facility. Fact finding 182, *supra.* It is undisputed that B & W built a liquid $CO_2$ tobacco expansion facility, operated it, and expanded tobacco with it for years before conceiving the gaseous $CO_2$ impregnation theory. Fact finding 114, *supra.* Given this state of the record, the court is not persuaded that the patented claims include an incorrect or questionable theory of operation or contain a limitation impossible

to meet under section 112.[13] *Cf. Raytheon v. Roper*, 724 F.2d at 956. B & W's understanding of the utility of the claimed process is best evidenced by its conduct—an expenditure of some $18.5 million to design, build and construct a liquid $CO_2$ expansion facility in Macon, Georgia. Fact findings 182, 219, *supra*. At a minimum, B & W has failed to present clear and convincing evidence that the patented claims lack utility under section 101 or enablement under section 112. In fact, the evidence is overwhelmingly to the contrary. Fact finding 115, *supra*. Therefore, the patented claims cannot be held invalid for lack of utility or enablement.

Turning to the infringement inquiry, the court's determination that gaseous $CO_2$ impregnation does not occur in the patented process to the exclusion of liquid $CO_2$ impregnation and vice versa leaves B & W on very shaky ground. A comparison of the patented claims to B & W's apparatus and process shows that the MET process bears a striking resemblance to the preferred embodiment of the DIET apparatus and process described in the '013 patent. Fact findings 93–94, 116–21. The specification of the '013 patent teaches several means and methods of performing the expansion step by exposing the frozen tobacco to a positive heat source. Thus, the '013 patent's specification effectively rebuts defendant's expert opinion that claim 17, the apparatus claim, somehow requires that the expansion step take place in the pressure vessel. *Cf.* fact findings 46 and 101. "[T]he law recognizes the irrelevance of apparatus distinctions in determining infringement of process claims." *Amstar Corp. v. Envirotech Corp*, 730 F.2d at 1482. The specification of the '013 patent

also discloses purging the impregnator with carbon dioxide gas. Plaintiffs' exhibit 1, col. 4, lines 56–58. Since the claims are construed in light of the specifications, the fact that the MET process and apparatus contain a gaseous $CO_2$ purging step and a separate piece of equipment to expand the tobacco is not sufficient to avoid infringement. *Cf. Carnegie Steel Co. v. Cambria Iron Co.*, 185 U.S. 403, 432, 22 S.Ct. 698, 709–10, 46 L.Ed. 968 (1902); *Raytheon v. Roper*, 724 F.2d at 957.

Plaintiffs have presented evidence showing that the accused MET process performs each of the process steps set forth in claims 1 and 16 and contains all of the apparatus set forth in claims 5 and 7 of the '013 patent. Fact findings 93–94, 116–21, *supra*. Moreover, B & W's corporate representative, Dr. John Jewell, testified on deposition that B & W practiced all three steps of claim 16 of the '013 patent in its MET process and had all the apparatus and means for doing so in the Macon facility. Fact findings 103–04, *supra*. Dr. Jewell had seen, read, and discussed the patents in suit with other B & W employees before being deposed. Fact finding 106, *supra*. Dr. Jewell's attempt to recant his testimony the next day came too late to undo the damage done by his admissions.

In conclusion, the court is of the opinion that plaintiffs have carried their burden of proving infringement of claims 1, 5, 16 and 17 of the '013 patent in suit by a preponderance of the evidence.

B & W is also accused of infringing claims 1 and 2 of the '014 improvement patent in suit. There is no dispute that MET process tobacco has an input O.V. level within the range specified by the pat-

---

**13.** This court is not expert in physics, chemistry, or chemical engineering but does have some expertise in law. Accordingly, the court cannot say with the necessary degree of confidence that liquid $CO_2$ impregnation takes place in the DIET process to the exclusion of gaseous $CO_2$ impregnation or vice versa; nor could the experts. The court suspects that both take place as plaintiffs' experts testified; defendant's expert did not prove otherwise. However, the court is convinced, based on the evidence and the applicable law, that the fact that the claimed process indisputably achieves its intended result, ex-

panded tobacco, is legally significant. On the other hand, an understanding of the precise scientific mechanism by which the process works is not essential to patentability because scientific principles and natural phenomena are not patentable. *E.g., Diamond v. Diehr*, 450 U.S. 175, 185, 101 S.Ct. 1048, 1056, 67 L.Ed.2d 155 (1981); *Diamond v. Chakrabarty*, 447 U.S. 303, 309, 100 S.Ct. 2204, 2207–08, 65 L.Ed.2d 141 (1980); *Parker v. Flook*, 437 U.S. 584, 593, 98 S.Ct. 2522, 2527, 57 L.Ed.2d 451 (1978); *LeRoy v. Tatham*, 55 U.S. 156 (14 How. 156, 175, 14 L.Ed. 367 (1853)).

ented claims and that the process operates at 400 p.s.i.g., again within the range specified by the patented claims. Fact findings 93–94, 122–24, *supra.* Defendant's expert based his non-infringement opinion on his gaseous $CO_2$ to the exclusion of liquid $CO_2$ impregnation theory, and the fact that MET tobacco presently has an exit O.V. level of 9–10% instead of about 6% as specified by claim 1. Fact finding 102, *supra.* The court has discussed the theory of operation and determined it is not an adequate basis for a finding of invalidity due to lack of utility or enablement, *supra.* It is not necessary to repeat that discussion again here. Thus, the about 6% limitation is the only remaining point of non-infringement, and on this point the evidence is crystal clear: B & W's exit O.V. content was within the patented claim until after this lawsuit was filed. Fact findings 125–27, *supra.*

The law of infringement states that, "[a]ccused products made, sold, or used and accused processes performed, before suit must be compared with the claims." *Amstar Corp. v. Envirotech Corp.,* 730 F.2d at 1482. Comparing the MET process before suit with claim 1 of the '014 patent in suit establishes that the MET process literally infringed claims 1 and 2 of the '014 patent until this suit was filed. Fact finding 126, *supra.* The fact that B & W subsequently raised its exit moisture levels is of no avail either. B & W has its own method of measuring O.V. or moisture content which gives a higher reading than the method specified in the '014 patent, the Philip Morris method. Fact finding 14–15, 127 *supra.* The law is settled that patents are to be liberally construed, and "patentees are not confined to normal dictionary meanings." *Fromson v. Advance Offset Plate, Inc.,* 720 F.2d 1565, 1569 (Fed.Cir.1983), *on appeal after remand,* 755 F.2d 1549 (1985); 4 *Deller's Walker on Patents* §§ 225, 226 (2d ed. 1965) (cases cited therein). Given the fact that B & W's method of measuring O.V. content gives a higher reading than the method specified in the '014 patent, "about 6%" can be liberally construed to encompass the MET process exit O.V. content of 9–10%.

Alternatively, a process or product that does not literally infringe can be deemed to infringe under the doctrine of equivalents. *Atlas Powder v. E.I. du Pont de Nemours,* 750 F.2d at 1579. The Supreme Court has defined the doctrine and delineated a tripartite test for finding equivalence:

> The essence of the doctrine is that one may not practice a fraud on a patent.... "To temper unsparing logic and prevent an infringer from stealing the benefit of the invention" a patentee may invoke this doctrine to proceed against the producer of a device "if it performs substantially the same function in substantially the same way to obtain the same result." *Sanitary Refrigerator Co. v. Winters,* 280 U.S. 30, 42, 74 L.Ed. 147, 156, 50 S.Ct. 9 [13]. The theory on which it is founded is that "if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form, or shape." *Union Paper-Bag Machine Co. v. Murphy,* [7 Otto 120, 125] 97 U.S. 120, 125, 24 L.Ed. 935, 936.... What constitutes equivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case. Equivalence, in the patent law, is not the prisoner of a formula and is not an absolute to be considered in a vacuum. It does not require complete identity for every purpose and in every respect. In determining equivalents, things equal to the same thing may not be equal to each other and, by the same token, things for most purposes different may sometimes be equivalents. Consideration must be given to the purpose for which an ingredient is used in a patent, the qualities it has when combined with the other ingredients, and the function which it is intended to perform.

*Graver Tank & Manufacturing Co. v. Linde Air Products Co.,* 339 U.S. 605, 608–09, 70 S.Ct. 854, 856–57, 94 L.Ed. 1097 (1950); *accord Atlas Powder,* 750 F.2d at 1579.

There can be little question that the MET process performs substantially the same

function—processing tobacco to achieve expansion; in substantially the same way—the only deviation consists of raising exit O.V. levels from about 6% to about 9–10%; to yield substantially the same result—expanded tobacco. Fact findings 122–28, *supra.* Considering B & W's professed reason for raising its exit O.V. levels, to improve product quality, does not alter the fact that this change was undertaken after suit was filed.[14] Furthermore, the '014 patent does not speak in terms of product quality or sugar or glycerin levels. *See* plaintiffs' exhibit 1A.

B & W's alteration of one element of its MET process after this lawsuit was filed presents a situation analogous to that discussed by the *Atlas Powder* court where it stated:

> We agree with *Bendix Corp. v. United States,* 199 USPQ 203 (Ct.Cl.Trial Div. 1978), *aff'd,* 600 F.2d 1364, 220 Ct.Cl. 507, 204 USPQ 617 (1979). There the trial judge said that where defendant has appropriated the material features of the patent in suit, infringement will be found "even when those features have been supplemented and modified to such an extent that the defendant may be entitled to a patent for the improvement." 199 USPQ at 221–22. Though Du Pont argues that cases from other courts support a contrary result, we are not bound by those cases and in any event find them unpersuasive.

*Atlas Powder v. E.I. du Pont de Nemours,* 750 F.2d at 1581 (footnote omitted). The *Atlas Powder* court confronted a situation where the accused product avoided literal infringement by changing one ingredient of a claimed composition. *Id.* at 1579–80. The district court's finding of infringement was affirmed on appeal. *Id.* at 1582. Accordingly, it is this court's opinion that the doctrine of equivalence would apply here to compel a finding that the MET process has infringed claims 1 and 2 of the '014 patent since approximately July, 1984, when B & W raised its exit O.V. levels.

To summarize, plaintiffs have carried their burden on the infringement issue by a preponderance of the evidence. B & W's MET process and apparatus literally infringes claims 1, 5, 16 and 17 of the '013 patent in suit, literally infringed claims 1 and 2 of the '014 patent until approximately July, 1984, and continues to infringe claims 1 and 2 of the '014 patent under the doctrine of equivalents. However, B & W urges the court to apply the doctrine of intervening rights because reissue patents and claims are asserted against it.

The doctrine of intervening rights is based on 35 U.S.C.A. § 252 (West 1984),[15]

---

**14.** Dr. Jewell stated that B & W changed the MET process exit O.V. level due to its relationship to product quality. Trial Vol. VIII at 826. On cross-examination, Dr. Jewell admitted that as exit moisture goes up, fill value goes down. Trial Vol. IX at 887. While the court did not find this as fact, it is certainly arguable that B & W sacrificed fill value to avoid literal infringement.

**15.** 35 U.S.C.A. § 252 (West 1984) provides in relevant part:

> The surrender of the original patent shall take effect upon the issue of the reissued patent, and every reissued patent shall have the same effect and operation in law, on the trial of actions for causes thereafter arising, as if the same had been originally granted in such amended form, but in so far as the claims of the original and reissued patents are identical, such surrender shall not affect any action then pending nor abate any cause of action then existing, and the reissued patent, to the extent that its claims are identical with the original patent, shall constitute a continuation thereof and have effect continuously from the date of the original patent.
>
> No reissued patent shall abridge or affect the right of any person or his successors in business who made, purchased or used prior to the grant of a reissue anything patented by the reissued patent, to continue the use of, or to sell to others to be used or sold, the specific thing so made, purchased or used, unless the making, using or selling of such thing infringes a valid claim of the reissued patent which was in the original patent. The court before which such matter is in question may provide for the continued manufacture, use or sale of the thing made, purchased or used as specified, or for the manufacture, use or sale of which substantial preparation was made before the grant of the reissue, and it may also provide for the continued practice of any process patented by the reissue, practiced, or for the practice of which substantial preparation was made, prior to the grant of the reissue, to the extent and under such terms as the

the rationale being "the public has the right to use what is not specifically claimed in the original patent." *Seattle Box Co. v. Industrial Crating and Packing Inc.*, 756 F.2d 1574, 1579 (Fed.Cir.1985). The *Seattle Box* court set forth a test for determining when equity dictates that the court apply this defense and fashion an appropriate remedy:

> In the first *Seattle Box* opinion we set forth a single straightforward test, derived from § 252, for determining when the doctrine of intervening rights might protect an alleged infringer: *whether the claims of the original patent repeated in the reissue patent are infringed.* Because no claim from the original patent was repeated in the reissue patent, we held that the defense of intervening rights was properly raised. 731 F.2d at 830, 221 USPQ at 576.

*Id.* at 1579 n. 6 (emphasis added).

In the present case, the court has specifically found that the MET process infringes valid claims of the reissued patents in suit which were also present in the original patents. Fact findings 9, 11, 152, *supra.* Thus, the *Seattle Box* test dictates but one result—the doctrine of intervening rights does not apply to shield the MET process from liability.

One final issue remains to be resolved before turning to the contract claims, antitrust counterclaim, and the question of damages—do the facts and the applicable law support a finding of willful infringement in the present case? Not surprisingly, plaintiffs strongly contend that the facts support such a finding while defendant vigorously argues to the contrary.

The Federal Circuit has considered the issue of willful infringement in many cases and prescribed a totality of the circumstances test "in determining whether a reasonable person would prudently conduct himself with any confidence that the courts might hold the patent invalid." *Central Soya Co., Inc. v. Geo. A. Hormel & Co.*, 723 F.2d 1573, 1577 (Fed.Cir.1983); *see also*

*American Original Corp. v. Jenkins Food Corp.*, 774 F.2d 459, 464–65 (Fed.Cir.1985). "The court must determine that the infringer acted in disregard of the patent, that is, that the infringer had no reasonable basis for believing it had a right to do the acts." *Stickle v. Heublein, Inc.*, 716 F.2d 1550, 1565 (Fed.Cir.1983).

B & W stresses the fact that it obtained advice of counsel opinions from outside patent attorneys as sufficient evidence of good faith to negate a finding of willfulness. Federal Circuit precedent is clear on this point:

> Where, as here, a potential infringer has actual notice of another's patent rights, he has an affirmative duty to exercise due care to determine whether or not he is infringing. *See Milgo Electronic Corp. v. United Business Communications, Inc.*, 623 F.2d 645, 666, 206 USPQ 481, 497 (10th Cir.1980), *cert. denied*, 449 U.S. 1066, 101 S.Ct. 794, 66 L.Ed.2d 611 (1980). Such an affirmative duty includes, *inter alia*, the duty to seek and obtain competent legal advice from counsel before the initiation of any possible infringing activity. *See General Electric [Co. v. Sceaky Brothers, Inc.*, 415 F.2d 1068 (6th Cir.1976) ] *supra*, at 1073–74, 163 USPQ at 261; *Marvel Specialty Co. v. Bell Hosiery Mills, Inc.*, 386 F.2d 287, 155 USPQ 545 (4th Cir.1967), *cert. denied*, 390 U.S. 1030, 88 S.Ct. 1409, 20 L.Ed.2d 286 (1968).

*Underwater Devices, Inc. v. Morrison-Knudsen Co.*, 717 F.2d 1380, 1389–90 (Fed. Cir.1983). There is no doubt B & W had actual notice of plaintiffs' patent rights: B & W was involved in negotiating the patent license and know-how license agreements with BOC on behalf of BATCO; B & W was aware of the interference proceeding between Philip Morris and BOC and its outcome; B & W obtained foreign counterparts of the patents in suit before they issued in the United States; B & W knew

court deems equitable for the protection of investments made or business commenced before the grant of the reissue.

when the patents in suit issued. *E.g.*, fact findings 74–78, 144–45, 167, *supra*.

B & W did seek and obtain four opinion letters from outside patent counsel evaluating the patents in suit. Fact finding 151, *supra*. However, only the last two letters received, dated August 23, 1983, and November 4, 1983, unequivocally express the opinion that the claims of the patents in suit are invalid for obviousness and that no valid claims would be infringed by the MET process. *Id.* B & W's MET facility became operational in December, 1982, and reached commercial scale in early 1983, well before receipt of these letters. *Id.* Thus, B & W initiated its infringing activities before it received unequivocal advice from counsel, since only the November, 1983, letter actually addressed the infringement issue.

Nor can B & W seriously base a good faith argument on its belief that the gaseous impregnation theory of operation sufficiently distinguishes the MET process from the claimed process in suit. The tests from which defendant's expert derived this theory were not initiated until October 10, 1985—almost three years after the MET facility began operations and only three weeks before the trial of this case began. Fact finding 109, *supra*. The evidence is clear: B & W operated its MET process until the very eve of trial without any distinguishing theory of operation. Furthermore, the evidence showed that B & W had contemplated its eventual course of action as early as January, 1979, when internal correspondence comparing DIET royalties with G–13 royalties noted:

> In the latter case [DIET], there is an even more favorable aspect, an additional, almost two million dollar annual possibility exists if:
> 1. No U.S. patent issues on the DIET process.
> 2. *B & W decides to challenge the weak patent they may obtain.*

Fact finding 149, *supra* (emphasis added).

B & W accrued patent royalties in the event an obligation to pay them ever became a reality. Fact finding 146, *supra*. B & W's vice-president of research and development advised upper management upon the issuance of the patents in suit in the United States to "weigh our alternatives when they pick us up on the Macon unit." Fact finding 145, *supra*. The totality of the circumstances compels but one conclusion: B & W made a business judgment and decided to take a calculated risk, to infringe the patents in suit and to challenge their validity in court if and when the necessity arose. The time to pay the piper is at hand; B & W's infringement of the patents in suit was and is willful and deliberate. Fact finding 152, *supra*.

In conclusion, B & W has not carried its burden of proving by clear and convincing evidence that the patents in suit are invalid or unenforceable due to inequitable conduct. Plaintiffs, on the other hand, have shown infringement by a preponderance of the evidence. The court will address the issue of damages further, after its discussion of the contract claims and the antitrust counterclaims.

## II. THE CONTRACT CLAIMS

In addition to the Count I claim alleging patent infringement, plaintiffs have asserted several claims sounding in contract against defendant, specifically: Count II alleging breach of contract, Count III alleging unjust enrichment, and Count IV alleging misappropriation of trade secrets (collectively "the contract claims"). Fact finding 160, *supra*. All the contract claims are premised upon and pivot around one issue: Whether B & W was licensed to use plaintiffs' trade secret know-how in connection with the design and construction of its Macon expanded tobacco facility. If B & W was not licensed or within its rights in using plaintiffs' know-how, the question becomes whether B & W misappropriated plaintiffs' trade secret know-how by such use and was unjustly enriched thereby. It is undisputed that B & W used plaintiffs' know-how to design, build, and operate its Macon expanded tobacco facility. Fact finding 182, *supra*. It is equally undisputed that plaintiffs did not object to the use of their know-how until this lawsuit

was filed despite their knowledge of and active encouragement of B & W's actions. Fact findings 183–84, *supra.*

Plaintiffs contend that B & W breached the confidentiality agreement between the parties by using the know-how to design and build a DIET plant instead of using it for evaluation purposes only and that this use constitutes misappropriation of trade secrets by which B & W has been unjustly enriched. *See* fact finding 169, *supra.* B & W contends that it was within its rights in using the know-how because it obtained a valid know-how sublicense under the BATCO Know-How License Agreement. Consequently, B & W maintains it has neither misappropriated plaintiffs' trade secrets nor been unjustly enriched thereby, since it bought and paid for a right to use the know-how by virtue of its know-how sublicense. Additionally, B & W asserts both laches and equitable estoppel as defenses against plaintiffs' claims.

The circumstances and negotiations between the parties underlying the contract issues are set forth in some detail in the court's findings of fact 160–208, *supra,* and need not be repeated here. The bottom line is simple and straightforward: The court is persuaded by the documentary evidence that B & W was licensed under the Know-How Agreement as of November, 1979. Fact finding 188, *supra. See generally Stickle v. Heublein, Inc.,* 716 F.2d 1550, 1558–59 (Fed.Cir.1983) (affirming trial court's holding that defendant had no implied patent license and defenses of license and estoppel without merit); *St. Regis Paper Co. v. Royal Industries,* 552 F.2d 309, 314–15 (9th Cir.), *cert. denied,* 434 U.S. 996, 98 S.Ct. 633, 54 L.Ed.2d 490 (1977) (barring royalties for know-how where patent rights and know-how intimately intertwined and patent invalid for obviousness). Furthermore, the evidence overwhelmingly demonstrates that plaintiffs transferred the know-how directly to B & W pursuant to the Know-How License Agreement, not the confidentiality agreement. Fact findings 170–72, 179, 180–81, *supra.* Therefore, B & W has not breached its confidentiality agreement with plaintiffs with respect to the know-how.

However, the Know-How License Agreement imposed an obligation on each licensed subsidiary to take a patent license under any of the patent rights in the country where that subsidiary was licensed to use the know-how "if the PATENT RIGHTS extend to such country." Fact finding 191, *supra.* There is no question that the basic DIET patents had not issued in the United States in September, 1978, when the Know-How License Agreement was executed. Fact finding 193, *supra.* B & W contends that because the DIET patents had not issued in the United States in September, 1978, it was under no obligation to take a patent sublicense then or now. B & W also argues that paragraph 6(b) of the Know-How License Agreement does not impose such an obligation. *See* fact finding 177, *.supra.* Plaintiffs dispute this construction of the relevant contracts and assert that B & W had a continuing obligation to take a patent license when valid patents within the contract's definition of patent rights issued in the United States. Plaintiffs argue that they are not in the business of setting their competitors up to infringe their patents—the net effect of B & W's construction of the contract.

Paragraphs 6(b) and (c) of the Know-How License Agreement govern BATCO's right to grant sublicenses to its subsidiaries and are reproduced at fact finding 177, *supra.* Paragraph 6(b) provides that a subsidiary will take a patent license in the country in which it is licensed to use the know-how if patent rights extend to that country. *Id.* The great weight of the evidence demonstrates that the parties intended that a subsidiary licensed under the know-how would also take a patent license. Fact finding 199, *supra.* The problem lies in the somewhat inartful wording of paragraph 6(b); however, paragraph 6(b) references the patent license agreement for the governing definition of patent rights. Fact finding 177, *supra.* Patent rights are defined to include "(ii) all patents now or hereafter owned by Philip Morris ... directed to a process for expanding smoking material which comprises the steps of ... any apparatus specifically adapted for use

in practicing such process," as well as "(i) all patents issued throughout the world based upon U.S. Patent Applications Serial No. 439,804 ... and Serial No. 441,767 [the basic DIET patent applications]." Fact finding 192, *supra.* Thus, the agreement's definition of patent rights clearly contemplates a continuing obligation to take a patent license when it states, "now or hereafter owned." *Id.*

The first DIET patent within this definition to issue in the United States was the Markwood patent which issued August 21, 1979. Fact finding 194, *supra.* The evidence showed B & W was aware of the existence of this patent. Fact findings 195–97, *supra.* The court believes B & W had an obligation to take a patent license when it became sublicensed under the know-how because the Markwood patent had already issued. Fact findings 194–99, *supra.* B & W clearly breached this obligation when it refused to take a patent license. However, this breach of an obligation imposed by the Know-How License Agreement and the Patent License Agreement does not constitute a breach of the confidentiality agreement which does not impose a like obligation and which is the only contractual breach asserted against B & W. Plaintiffs have not carried their burden of proof and persuaded the court that B & W's actions constitute a breach of the confidentiality agreement.

Plaintiffs also contend that B & W misappropriated their trade secrets by using the know-how to design and build the Macon facility. A trade secret is defined as:

> Any formula, pattern, device or compilation of information which is used on one's business and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.

*University Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 534 (5th Cir.1974) (quoting Restatement of Torts § 757 comment b (1934)). Generally speaking, liability attaches for misappropriation of trade secrets under the Restatement if one discloses or uses another's trade secrets without a privilege to do so in breach of confidence reposed in him by the owner in disclosing such secrets to him. *Id.* It is undisputed that the parties considered the know-how to be trade secrets and acted accordingly. *E.g.,* fact findings 164–65, 168, 182.

Since the court has previously found that B & W was validly sublicensed under the Know-How License Agreement, it can hardly have misappropriated trade secrets it had a right to use. Plaintiffs still retain the use and value of their trade secret know-how with respect to potential licensees; there is no evidence that B & W has publicly disclosed the know-how to competitors or has taken any actions to diminish its value. *See id.* at 535. In fact, B & W took steps to protect plaintiffs' trade secrets including having their engineering firm sign a secrecy agreement before providing it with a copy of the know-how. Fact finding 182, *supra.* In short, plaintiffs have not made out a case of misappropriation of trade secrets.

Finally, plaintiffs assert that B & W has been unjustly enriched by its use of their trade secret know-how in violation of the confidentiality agreement. However, this claim, like the claim for misappropriation of trade secrets, is negated and rebutted by the court's finding that B & W was sublicensed to use the know-how. It logically follows that if B & W did what it had a right to do, use the know-how to build its MET facility, it was not unjustly enriched thereby. B & W's operation of the MET facility to expand tobacco without the benefit of a patent license and without paying patent royalties is a different issue altogether. The court is simply of the opinion that no unjust enrichment has been shown on the record before it. B & W has raised and both parties have briefed the defenses of laches and equitable estoppel. Given the court's finding that B & W had and has a valid sublicense under BATCO's Know-How License Agreement, discussion and consideration of these affirmative defenses is not required.

At the trial of this case, defendant made a motion for involuntary dismissal of Counts II, III, and IV at the close of plaintiff's evidence pursuant to Rule 41(b) of the

Federal Rules of Civil Procedure. In accordance with the rule, the court declined to render any judgment until the close of all the evidence. The evidence is now closed and upon full consideration of the record, the court is persuaded that plaintiffs have shown no right to relief under the facts and the applicable law. Accordingly, defendant's motion for involuntary dismissal is hereby GRANTED and Counts II, III, and IV are DISMISSED. Fed.R.Civ.P. 41(b).

## III. THE ANTITRUST COUNTERCLAIM

■ B & W has filed a counterclaim against plaintiffs based on alleged antitrust violations of sections 1, 2, and 4 of the Sherman Act, 15 U.S.C. §§ 1, 2, and 4, and sections 3, 4, and 16 of the Clayton Act, 15 U.S.C. §§ 14, 15, and 26. Basically, B & W alleges that plaintiffs have acted in concert with the common goal of restraining trade and attempting to monopolize the relevant United States market by unlawfully tying together the licensing of their know-how and their patents, misrepresenting material facts to the PTO, and attempting to enforce invalid, uninfringed patents against B & W. Defendant's answer defines the relevant market as "the market for dry ice expanded tobacco technology in this country and abroad." Answer, Count III, § 19 (filed August 2, 1984). Under this definition plaintiffs perforce monopolize since there are only two expanded tobacco processes available for commercial license, Reynolds' G-13 process and plaintiffs' DIET process. Fact finding 56, *supra*. Of these two, only plaintiffs' DIET process involves solid $CO_2$ or dry ice. Fact finding 28, *supra*. This definition of the relevant market is unduly restrictive.

B & W produced virtually no evidence at trial in support of its antitrust counterclaim. Fact finding 209, *supra*. While Mr. Goldsmith, former Chief Executive Officer at Philip Morris, testified on cross-examination that a market for expanded tobacco processes exists in the United States, there was no testimony on the size and scope of the relevant market, plaintiffs' share of that market, or more importantly R.J. Reynolds' share of the market. Fact find-

ing 210, *supra*. The manager of plaintiffs' licensing program testified that plaintiffs compete with the Reynolds' G-13 processes. *Id.* No other evidence was introduced.

The standard set forth by the Supreme Court to show a section 2 violation is: "whether the defendants control the price and competition for such part of trade or commerce as they are charged with monopolizing.... control in the above sense of the relevant market depends upon the availability of alternative commodities for buyers." *United States v. E.I. du Pont deNemours & Co.*, 351 U.S. 377, 380, 76 S.Ct. 994, 999, 100 L.Ed. 1264 (1956). The court cannot make a determination of the relevant market under the above standard without evidence. Therefore, the court declines to do so.

B & W bears the burden of proving its other antitrust allegations by clear and convincing evidence, because it contends that plaintiffs knowingly and in bad faith prosecuted an infringement action against it based on fraudulently procured, invalid claims. *E.g., Walker Process Equipment v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 179, 86 S.Ct. 347, 351, 15 L.Ed.2d 247 (1965); *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 876–77 (Fed.Cir.1985); *Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986, 996 (9th Cir.1979), *cert. denied*, 444 U.S. 1025, 100 S.Ct. 688, 62 L.Ed.2d 659 (1980). The court has previously found against B & W on both of these charges because B & W failed to produce clear and convincing evidence from which the court could infer either inequitable conduct or that the patented claims lacked validity. It therefore follows that plaintiffs' attempt to enforce their patents does not constitute a violation of the antitrust laws. Plaintiffs have the right to preclude others from making, using, and selling their patented invention and to enforce these rights until their patents are held invalid. *Handgards*, 601 F.2d at 993; *see also Concrete Unlimited, Inc. v. Cementcraft, Inc.*, 776 F.2d 1537, 1539 (Fed.Cir.1985) (reversing trial court's finding that patentee engaged in unfair

competition by enforcing patent rights through litigation).

B & W has not produced additional evidence of conspiracy to restrain trade or specific intent to monopolize the relevant market beyond its assertions that plaintiffs attempted to conceal and later abandoned the work of Mr. Michals, and that plaintiffs' cross-licensing agreement evidences an intent to abuse the patent system. However, the evidence showed that BOC withdrew the Michals patent application because it lost the interference proceeding, not because of a conspiracy. Fact findings 213–14, *supra*. Likewise, Mr. Michals' work was fully before both the PTO and the New Jersey District Court, there is no evidence that plaintiffs conspired to conceal it. Fact findings 17–25, *supra*. Finally, the existence of a cross-licensing agreement is neither so unusual nor so devious in and of itself as to support a finding of specific intent to combine, conspire, and monopolize trade. Fact findings 211–12, 215, *supra*. *See also Stratoflex v. Aeroequip*, 713 F.2d at 1533 (facts showed parties to interference proceeding entered agreement providing that loser of interference would receive royalty-free license).

The Supreme Court has recently stated in a different antitrust context that, "courts should not permit factfinders to infer conspiracies when such inferences are implausible, because the effect of such practices is often to deter pro-competitive conduct." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, — U.S. ——, 106 S.Ct. 1348, 1360, 89 L.Ed.2d 538 (1986). Likewise, a judge sitting as factfinder should not infer conspiracies where the evidence indicates none in fact exist. While there can be no doubt that a patentee's conduct can amount to violations of the antitrust laws under certain facts, those facts are not before this court. Accordingly, defendant's antitrust counterclaim is hereby DISMISSED.

## IV. DAMAGES

Congress has specified that a successful patentee in an infringement suit shall be awarded damages "adequate to compensate for the infringement, but in no event less than a reasonable royalty." 35 U.S.C.A. § 284 (West 1984).[16] Congress has also provided that a court may award attorney fees in an exceptional case. 35 U.S.C.A. § 285 (West 1984).[17]

The court has previously considered the issue of willful infringement in its patent infringement discussion, *supra*, and found by a totality of the circumstances that B & W willfully and deliberately infringed the patents in suit. Fact finding 152, *supra*. That discussion need not be repeated here. The court also found that the eight cents/four cents rate established by plaintiffs' patent license agreements with BATCO, American Brands, and Rothmans International constitutes an established royalty for the practice of plaintiffs' patented inventions. Fact findings 221–24, *supra*. However, the court will not determine whether this established royalty amounts to a reasonable royalty within the meaning of the statute at this time. It is worth noting that the Federal Circuit has stated that, "a reasonable royalty, when it can be determined, and which may be equivalent to an established royalty is merely the floor below which damages shall not fall." *Bandag, Inc. v. Gerrard Tire Co., Inc.*, 704 F.2d 1578, 1583 (Fed.Cir.1983); *accord Stickle v. Heublein, Inc.*, 716 F.2d 1550, 1563 (Fed.Cir.1983).

**16.** 35 U.S.C.A. 284 (West 1984) provides:

Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.

When the damages are not found by a jury, the court shall assess them. In either event the court may increase the damages up to three times the amount found or assessed.

The court may receive expert testimony as an aid to the determination of damages or of what royalty would be reasonable under the circumstances.

**17.** 35 U.S.C.A. § 285 (West 1984) provides:

The court in exceptional cases may award reasonable attorney fees to the prevailing party.

After carefully weighing all the facts and circumstances before it, the court concludes that this is an exceptional case within the meaning of section 285 given B & W's calculated, willful infringement and its blatant plagarism of plaintiffs' patented processes. Fact findings 128, 227, *supra.* *See Standard Oil Co. v. American Cyanamid Co.,* 774 F.2d 448, 455 (Fed.Cir.1985); *Central Soya, Inc. v. George A. Hormel & Co.,* 723 F.2d 1573, 1576–78 (Fed.Cir.1983). Accordingly, the record in this case justifies an award of attorney fees and expenses. Finally, this is an appropriate case for an award of pre-judgment interest. *General Motors Corp. v. Devex Corp,* 461 U.S. 648, 657, 103 S.Ct. 2058, 2063, 76 L.Ed.2d 211 (1983).

## VI. CONCLUSION

It is the considered opinion of this court that the case before it is primarily and preeminently a patent case. While the contract claims and antitrust counterclaim are more than mere windowdressing, they nevertheless do not comprise claims on which the pleaders have shown a right to relief upon the facts before the court and the applicable law. Accordingly, Counts II, III and IV of plaintiffs' complaint are hereby DISMISSED. Fed.R.Civ.P. 41(b). Further, defendant's antitrust counterclaim is hereby DISMISSED. Fed.R.Civ.P. 41(c).

With respect to the patent claims, it is the opinion of this court that defendant has failed to carry its burden of proving facts requiring a holding of invalidity with regard to the asserted claims of United States Patent Re. 32,013 and United States Patent Re. 32,014. In addition, it is the opinion of this court that United States Patent Re. 32,013 and United States Patent Re. 32,014 are both enforceable and the enumerated claims infringed under the evidence before the court and the laws of these United States. Accordingly, Brown and Williamson Tobacco Corporation is hereby permanently ENJOINED from further making, using, selling, manufacturing,

or causing to be made any expanded tobacco, expanded tobacco product or products including but not limited to cigarettes, that employ or derive from the use of its MET process. 35 U.S.C.A. § 283 (West 1984).[18] This order is binding upon the parties to this action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of this order. It is further ORDERED, ADJUDGED, and DECREED that plaintiffs are entitled to an ACCOUNTING as to defendant's production and manufacture of expanded tobacco and expanded tobacco products deriving from the use of its MET process for the purpose of establishing MET profits. The parties are invited to suggest within fifteen days how the remaining damage issues should be resolved.

---

**18.** 35 U.S.C.A. § 283 (West 1984) provides in relevant part:

> The several courts having jurisdiction of cases under this title may grant injunctions in

accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable.